578 So.2d 304 (1991)
Judy MAST, Etc., Appellant,
v.
Michael Lee REED, Appellant.
No. 89-1146.
District Court of Appeal of Florida, Fifth District.
March 14, 1991.
Rehearing Denied April 30, 1991.
*305 Michael R. Walsh, Orlando, for appellant.
Patricia Butler Vitter, Inverness, for appellee.
EN BANC
HARRIS, Judge.
On June 30, 1984 Michael Reed and Judy Mast, formerly Judy Reed, were married in Inverness, Citrus County, Florida. They are the parents of Jason. The parties lived together in Citrus County until March 1986 when matrimonial difficulties arose. The mother and Jason moved to Brandon, Florida. The father exercised regular visitation with Jason until August, 1987 when the father moved to Madison, Florida to open a new business. After that, because of the press of business and limited finances, both his financial support and his visitation diminished. Prior to moving to Madison, the father entered into a property settlement agreement (February 17, 1987) granting primary residential custody of Jason to the mother. The agreement provided that neither party would remove the child from Florida "on a permanent basis" without prior order of court. The parties were divorced on May 7, 1987 and the final judgment incorporated the property settlement agreement.
The mother married James Mast on August 15, 1987 and the father remarried on March 18, 1988. Subsequent to their marriage, James Mast, for financial reasons, enlisted in the army and was stationed in North Carolina.
On September 2, 1988 the mother petitioned the court for leave to move with the child to North Carolina in order to be with her husband and her new child. During these proceedings she did move to North Carolina with the child; however, because she returned with the child to Florida every other weekend, the father never missed his regularly scheduled visitation.
The father resisted her move to North Carolina and counterpetitioned for primary residential custody alleging:
1. That the mother had removed the child from Florida on "a permanent basis";
2. That the move would interfere with the father-child relationship and would hamper the concept of shared parental responsibility; and
3. That the father was more capable of providing parental guidance.[1]
The matter came on for hearing almost eight months after the mother's initial petition. The court denied the mother's petition to relocate the child.[2] The court did, however, grant the father's petition to change residential custody:
1. Because the mother removed the child from Florida "on a permanent basis";
2. Because the father "within the last year" had exercised all his visitation rights with the child and has integrated the child "into the father's family"; and
3. Because the grandparents reside within Florida and maintain continuing contact with Jason.
We recognize that the trial court has broad discretion in these most difficult cases; however, as the supreme court held in Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980), this discretion is not without limit.
The discretionary power that is exercised by a trial judge is not, however, without limitation, and both appellate and trial judges should recognize the concern *306 which arises from substantial disparities in domestic judgments resulting from basically similar factual circumstances. The appellate courts have not been helpful in this regard. Our decisions and those of the district courts are difficult, if not impossible, to reconcile. The trial court's discretionary power is subject only to the test of reasonableness, but that test requires a determination of whether there is logic and justification for the result. The trial courts' discretionary power was never intended to be exercised in accordance with whim or caprice of the judge nor in an inconsistent manner. Judges dealing with cases essentially alike should reach the same result. Different results reached from substantially the same facts comport with neither logic nor reasonableness. In this regard, we note the cautionary words of Justice Cardozo concerning the discretionary power of judges:
The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to "the primordial necessity of order in the social life." Wide enough in all conscience is the field of discretion that remains.
B. Cardozo, The Nature of the Judicial Process 141 (1921).
Canakaris at 1203.
Because the record fails to justify the court's decision, we find that it abused its discretion and we reverse.

PERMANENT MOVE
There was no evidence in the record to justify the finding that the mother's relocation of Jason to North Carolina to be near her husband was "permanent." It should be noted that the property settlement agreement adopted by the court in the final judgment granting the dissolution provided that the mother could live anywhere she pleased so long as any such move outside Florida would not be on a permanent basis. If one is required by military or civilian government employment to relocate outside the state, he does not lose his permanent residence status. Eckel v. Eckel, 522 So.2d 1018 (Fla. 1st DCA 1988). It is true that such a relocation might be for a substantial period of time  but the parties, by their agreement, contemplated that moves might occur and only prohibited permanent relocations. The record does not support the finding of a permanent[3] move.

GRANDPARENT CONTACT
The record totally fails to support the finding of paternal grandparent residence or any grandparent contact with Jason. The only appearance in the record in this regard is found in the court's order granting the change in custody.

INTERFERENCE WITH FATHER-SON CONTACT
Since the court denied the mother's petition to remove Jason from Florida, the allegation appears to be moot. In any event, the father failed to establish that the move would interfere with his father-child relationship. The proof, after eight months of experience, was that the father never missed a visitation while the mother was in North Carolina. Such cannot be said, however, of the period preceding the move when the father's erratic and rare visitation was the result of his commitment to his new business.
Simply put, the father did not sustain the allegations of his petition to change custody and it should have been denied.
*307 REVERSED with instructions to order the child returned to the mother under the provisions of the original final judgment.
PETERSON, GRIFFIN and DIAMANTIS, JJ., concur.
SHARP, W., J., concurs in part, dissents in part with opinion with which GRIFFIN, J., concurs.
COBB, J., dissents with opinion with which DAUKSCH, COWART and GOSHORN, JJ., concur.
SHARP, W., Judge, concurring in part, dissenting in part.
Originally, my opinion began as the proposed majority opinion for a three-judge panel. My goal was to bring this district's views on interstate moves for Florida parents who have primary residential custody of their children into harmony with those now expounded by our sister courts. See Lenders v. Durham, 564 So.2d 1186 (Fla. 2d DCA 1990); Sherman v. Sherman, 558 So.2d 149 (Fla. 3d DCA 1990); Zugda v. Gomez, 553 So.2d 1295 (Fla. 3d DCA 1989); Hill v. Hill, 548 So.2d 705 (Fla. 3d DCA 1989), rev. denied, 560 So.2d 233 (Fla. 1990); DeCamp v. Hein, 541 So.2d 708 (Fla. 4th DCA), rev. denied, 551 So.2d 461 (Fla. 1989); Bachman v. Bachman, 539 So.2d 1182 (Fla. 4th DCA 1989); Landa v. Landa, 539 So.2d 543 (Fla. 3d DCA 1989); Nissen v. Murphy, 528 So.2d 502 (Fla. 2d DCA 1988); Matilla v. Matilla, 474 So.2d 306 (Fla. 3d DCA 1985). To do so (in my view), however, requires the Fifth District to recede from our own case law on that issue: Cole v. Cole, 530 So.2d 467 (Fla. 5th DCA 1988); Jones v. Vrba, 513 So.2d 1080 (Fla. 5th DCA 1987); Giachetti v. Giachetti, 416 So.2d 27 (Fla. 5th DCA 1982). The case was thus reviewed en banc at my instigation.
I concur with the majority opinion that sufficient evidence was not adduced to support the trial judge's change of primary residential custody from the mother to the father. The trial judge's findings of fact have little or no basis for support in the record. For example, the trial judge "finds" as an important factor the presence of two sets of grandparents in Florida. However, only Mast's parents (the mother's) are mentioned in the transcript and then only in the context that Mast tried to make her parents' home in Homosassa Springs her residence after her husband was transferred to Ft. Bragg, North Carolina.
Madison, Florida, where Reed resides is about 150 miles northwest of Homosassa Springs. The transcript shows that the trial judge was piqued at Mast for making Reed drive from Madison to Homosassa Springs to pick up the child for visitation. Nothing in the transcript gives any comfort or support to the trial judge's assumption that the maternal grandparents in Homossassa Springs will have any practical opportunity to visit the child frequently in Madison. We do not know from the transcript where in Florida the paternal grandparents reside, but no one said they live in or near Madison, or that they ever had, or wished to have, significant continued contact with the child.[1]
*308 I dissent from the majority opinion, however, because it does not also reverse the trial court's denial of Mast's petition. The second shoe has yet to drop in this case and until it does, complete relief has been granted to neither party. As a result of this court's decision, Reed is denied permanent custody; but Mast cannot (as a matter of practicality) reside with Jason, her husband, and their new child in Fort Bragg. If she does, she must continue to drive Jason every other weekend, thousands of miles per month, to fulfill the required visitation schedule in the divorce decree.
I would also deal with Mast's petition to modify by allowing her to take Jason to North Carolina and grant Reed extensive summer visitation in lieu of alternate weekends in this appeal. Both Reed's and Mast's petitions were consolidated for hearing and the record before us concerns both. The trial court ruled on both petitions simultaneously when it granted Reed's. By implication that same order denied Mast's. To grant complete relief here, we should also overturn the trial court's denial of Mast's petition.
The original divorce decree contained a provision which prohibited either party from moving the child's permanent residence outside the state of Florida without either the consent of the other parent or a court order. Some courts have questioned the constitutionality of such provisions or the power of parties to foreclose consideration of a child's welfare by such agreement. See Bell v. Bell, 572 So.2d 841, 59 U.S.L.W. 2252 (Miss. 1990). However, Mast did not raise any constitutional issue and no Florida court has yet based an opinion concerning moves out-of-state on that ground.
The record in this case shows that after Mast remarried, her new husband enlisted in the United States Army and was stationed at Fort Bragg, North Carolina. Mast filed her petition seeking permission to move the child's residence. Reed opposed Mast's modification and petitioned for primary custody for himself because Mast had violated the anti-move provision by de facto moving the child to North Carolina prior to obtaining the court's permission.
The parties married in 1984 and divorced in 1987. While married they lived in Citrus County. Mast was awarded primary residential custody of the parties' then two-year-old son, Jason. She had been the primary caretaker of Jason since his birth.
Following the divorce, Mast and Jason moved to Hillsborough County where Mast worked as a clerk/cashier at Wal-Mart. Reed held various auto-mechanic jobs. He was unable or unwilling to meet his full child support obligation ($150.00 per week). There are at least three delinquent support certificates in the record, as late as 1989.
In 1987, Reed moved to Madison, Florida, to begin a new business: "Reflections Paint and Body Shop." He remarried and took on the support of a new spouse and her two children by a prior marriage. They had a financial struggle getting the business started. At the time of the modification hearing, it was making $5,800 per year. Reed testified that he was able to support his household of four people on an income of $377 per month. He and his new wife claimed they could adequately support Jason on the $50 per week "savings" achieved by not having to pay Mast child support. The trial judge agreed with Reed's attorney that Reed had a "lessened capacity" for paying child support at present than he did at the time of the original dissolution.[2]
After Reed moved to Madison, his visitation with Jason became infrequent. Madison is more than 170 miles north of Tampa, and the round trip required seven hours driving time. Reed admitted the distance and the demands of his new business limited the exercise of his visitation rights.
After Mast filed her petition to modify, Reed began to insist on all visitation rights provided in the dissolution decree. Mast complied by driving Jason to her parent's home in Homosassa Springs, which she *309 called her "permanent address." Reed would pick Jason up there, drive him to Madison and return him to Homosassa. Mast never missed a visitation period, and she made at least 13 round trips between Homosassa Springs and North Carolina before this matter got to trial.
Mast also remarried in 1987 and at the time of the modification hearing she and her new husband had a 14-month-old baby. Although Mast's husband was stationed at Fort Bragg, they regarded Florida as their permanent residence. They kept their Florida driver's licenses and voter registrations. It was always their plan to return to Florida. In fact, after Mast filed her petition to modify, her husband was injured in an accident and there was a good possibility he would be transferred to Florida permanently or that he would be discharged from the Army.
Mast testified that she sought to move Jason to North Carolina so that she could make a home for her new husband and child, and be a full-time mother for Jason. There were housing, recreational, and schooling advantages available for Army dependents at Fort Bragg, which would be in Jason's best interests. Jason was happy, well-adjusted, got along well with his stepfather, and needed the opportunity to grow up with his new brother. The financial circumstances of the Masts were considerably better than those of the Reeds, although that alone is not a determinative factor.
The Reeds testified that Jason was happy and well adjusted with them. He was close in age to one of Reed's stepchildren and they enjoyed playing together. He made friends in the Madison community and enjoyed attending church. The Reeds testified they formerly had a drinking problem, but they had given it up six to seven months prior to the hearing. They had also started regularly attending a local church.
The trial court announced its ruling in court, much to the distress and consternation of Mast, which was disclosed in the record. The judge stated that he found both parents were fit, and could offer Jason a good home and a good stepparent relationship. He decided to change custody from Mast to Reed because he found Mast had violated the original decree by removing Jason from Florida before getting permission to do so, and because Mast made Reed drive from Madison to Homosassa to exercise his weekend visitation rather than dropping the child off en route from North Carolina. By implication he denied Mast's petition.
This state's reporter system contains a bewildering array of decisions wrestling with the review of trial court orders which permit, or refuse to permit, a custodial parent to leave Florida with a minor child or children. Some courts have found determinative the fact that the original Florida decree prohibits removal of the child without court permission.[3] Others do not.[4] Some courts hold that this factor serves to place on the custodial parent the burden of proving a change of circumstances and the best interests of the child. Cole; McIntyre v. McIntyre, 452 So.2d 14 (Fla. 1st DCA 1984).
Other courts hold the trial court may freely impose such a restriction against leaving Florida at any time, should the custodial parent indicate a desire to leave the state.[5] This court said in Giachetti that it makes no difference whether or not the original decree contained a restriction against an interstate move. The move can be prohibited by the trial court if it will interfere with weekend or other frequent visitation of the noncustodial parent. The custodial parent has the burden of proof in justifying the interstate move.
To add to the confusion, the appellate courts use the same legal phrases, "substantial *310 change of circumstances" and "best interests of the child" in this context to mean entirely different things. Almost everyone agrees that the moving party seeking a petition to modify a custody judgment carries a "heavy" or "extraordinary" burden,[6] that he or she must prove a substantial change of circumstances, and that the best interests of the child are served.[7]
Exactly what does that mean in this context, and who has what burden? For example, the remarriage of a custodial parent and the need to relocate to be with a new spouse, or out-of-state improved job opportunities, or military assignment out-of-state, or other valid reasons, are held in some cases to be a sufficient showing of substantial change of circumstances to justify deletion of a prohibition against leaving Florida, and to permit a custodial parent and minor child to depart from Florida over the objection of a noncustodial parent.[8] From a strictly logical point of view (which does not always prevail in courts of law) a custodial parent's genuine need to leave Florida with a minor child because of a new marriage appears about as "material and substantial" a change in that party's life circumstances as is imaginable, short of being declared dead or paralyzed after being run over by a Mack truck.
Yet, this court has declared that proof of this vast change in the custodial parent's life is not substantial and material: See Cole; Giachetti. I submit that this controlling line of cases out of this court led to Mast's conclusion that she also failed to prove her case for modification of the original decree. This is why an en banc was required. Cole and Giachetti are fundamentally erroneous.
Florida appellate decisions are all over the map in determining what factors relate to establishing the "best interest of the child" in this context. Some focus almost entirely on the "interest" in maintaining frequent visitation/proximity for the benefit of the noncustodial parent.[9] But is that really all or even a major part of what should be involved in determining a child's "best interest" in this context of interstate moves?
Focusing narrowly on the noncustodial parent's biweekly visitation rights entirely ignores the devastating impact on the custodial parent if he or she[10] cannot leave this state. See Britt v. Shovein, 559 So.2d 749 (Fla. 4th DCA 1990); Hein. A child's day-to-day welfare depends much more on the custodial parent's circumstances than that of the visiting parent. To prohibit a move by the custodial parent may well deprive the child of greatly improved living *311 conditions. Nor is it realistic to say that a viable alternative open to the custodial parent is to choose between retaining custody of the child, or relocating to another state with a new spouse, or accepting an improved job and life-style. In most cases, both are flip sides of the same coin. I submit that in this day and age of our mobile population,[11] the jet airplane, and the UCCJA, it is both parochial and punitive to continue to confine Florida's custodial parents to this state as a matter of law, or face loss of residential custody of their children.
Our sister courts have adopted a better view than Cole, Giachetti and Jones. See Sherman; Zugda; Hill; Hein; Bachman; Landa; Nissen; Matilla. I think this court should overturn Cole, Giachetti and Jones and follow their lead. Our sister courts rely primarily on two New Jersey cases which offer well-reasoned opinions in this difficult area. D'Onofrio v. D'Onofrio, 144 N.J. Super. 200, 365 A.2d 27 (N.J. Super.), affirmed, 144 N.J. Super. 352, 365 A.2d 716 (N.J. Super. 1976); and Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (N.J. 1984). As Judge Anstead wrote dissenting in Costa v. Costa, 429 So.2d 1249 (Fla. 4th DCA 1983), "[t]he gist of the holdings in these cases is that the courts should utilize other means, such as increased summer visitation or a shift in the financial burden of visitation to deal with the problems and reserve the power to bar moves for the extreme cases." The 1982 Shared Parent rights legislation does not materially alter the law in this area. See Hill; McIntyre at 21.
In summary, our sister courts hold that when a custodial parent petitions for court permission to leave this state with a minor child where the divorce decree prohibits such a move, or the noncustodial parent objects to an interstate move, the parent seeking to remove the child has the burden of showing the following factors:
1. The prospective advantages of the move in terms of its likely capacity for either maintaining or improving the general quality of life of both the custodial parent and the child or children.
2. The legitimacy of the purpose or motivation for both the custodial parent's wish to relocate and the noncustodial parent's desire to restrain such a move. For example, is the custodial parent motivated by a desire to defeat or frustrate the noncustodial parent's visitation rights, and is he or she seeking to avoid future visitation orders of the court? Is the noncustodial parent contesting the move mainly to impede the custodial parent's plans or to secure a financial advantage with respect to future support payments?
3. Whether, under the facts of the individual case, a realistic and reasonable visitation schedule can be established if the move is allowed. The trial court should not "insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life-style for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial." D'Onofrio at 30.
The noncustodial parent may challenge this showing by establishing that alternative visitation is not feasible because of distance, time, or finances, or that the custodial parent is unlikely to comply with any alternative visitation provided for by a Florida court, once he or she leaves this jurisdiction.
4. The best interests of the child. This consideration is partly and inextricably involved in determining what is most advantageous to the custodial parent's family unit. Britt; DeCamp. In some cases it may be a matter for the trial court to determine which alternative is least harmful to the child.
*312 Applying that new rule of law to this case, the record establishes that the custodial parent carried her burden of showing a substantial change of circumstances under the Cooper and D'Onofrio test. She had remarried. Her new husband was stationed out-of-state, and her motivation for wishing to move with her new husband, baby and the child at issue in this case was clearly genuine and bona fide. She also established potential economic and physical benefits they could expect from the move. She would not be a single parent, working as a sales clerk, seeking to raise Jason without regular child support from Reed. Nor would she and the child be forced to spend long and senseless hours driving on interstate highways to keep the alternate weekend visitation schedule previously set by the court.
Mast also established that her requested move was not an effort to frustrate or deny Reed his weekend visitation. She meticulously met all visitation requirements under the decree, although it required her to drive long distances. In fact, Reed was the parent who did not exercise visitation when it was inconvenient for him to do so. There is also a suggestion in this record that Reed needs a break on paying child support, and that could be one reason he sought to change Jason's primary custody.
It further appears there is no reason why lengthy, extended summer and other visitations for Jason with Reed such as Mast offered in her petition could not be worked out in lieu of every other weekend visits. North Carolina is not further from Madison, Florida, than some cities in Florida itself.[12]See Britt. The economics or feasibility of transporting Jason from North Carolina to Madison is obviously not a problem since Mast did it over a considerable period of time. She also offered to continue to do so in the future. Placing the economic responsibility for transporting Jason on Mast would be an equitable requirement in this case. See Matilla.
Under such circumstances, the trial court erred in changing the custody of Jason from Mast to Reed. See Kuntz v. Kuntz, 464 So.2d 1349 (Fla. 1st DCA 1985). A move out of the state is not, standing alone, a sufficient basis to change primary residential custody. Sherman; Zugda; Nissen; Robinson. And, under the Cooper and D'Onofrio line of cases in Florida, Mast established a perfect record for the granting of her petition to modify. I concur in the reversal of change of custody to Reed, but I would also reverse the denial of Mast's petition and remand to the trial court to set a reasonable alternative visitation for Jason with Reed, which would include at least six weeks during the summer.
GRIFFIN, J., concurs.
COBB, Judge, dissenting.
This matter has been considered en banc because two members of the original panel (I was the third member) felt that we should recede from three prior opinions of this court: Cole v. Cole, 530 So.2d 467 (Fla. 5th DCA 1988); Jones v. Vrba, 513 So.2d 1080 (Fla. 5th DCA 1987); and Giachetti v. Giachetti, 416 So.2d 27 (Fla. 5th DCA 1982). During the course of en banc consideration, it became apparent that a majority of the court would not vote to recede from those prior opinions, however vituperative the proposed dissents. At that point the then en banc minority, affronted by the trial court's custody award, shifted their focus from a confrontation with case precedent to a search for a factual basis for reversal. The instant majority opinion represents the successful conclusion of that search, which has been a lengthy one: oral argument was held on February 20, 1990, followed by an en banc conference on May 21, 1990, after which resolution was delayed *313 until composition of this court changed in late October.
But, however enterprising in achieving their result, the majority have produced an opinion guilty of the very innovation condemned by Justice Cardozo in The Nature of the Judicial Process  which is quoted, ironically, in the majority opinion itself. The fact is that this court is reversing a trial judge for his failure to reach a result (i.e., continued custody of the minor child by the mother in Florida) that was never presented to him as a viable alternative, either by the presentation of argument or evidence at the trial level. The issue clearly posited by the parties to the trial judge was whether to leave primary residential custody of the child with the mother, who had moved to North Carolina with her new husband and new child, or to place it with the father, who now lives in Madison, Florida, with his new wife and step-children. The trial judge, after a full evidentiary hearing, chose the latter alternative, apparently agreeing with the father's argument that he offered the more stable home environment[1] and the better prospect for cooperative visitation afforded to the non-custodial parent.[2]
The mother, confronted with the father's modification motion, offered no evidence, or even suggestion, to the trial judge that she would, or could, move back to Florida to exercise custody of her son, Jason. That suggestion appears for the first time in this cause in the appellant's brief. The mother's unequivocal testimony below, in response to questioning by her own trial counsel, was that she should retain custody in North Carolina "because that is where my husband resides." She also testified that the Army post at Fort Bragg was a "permanent assignment" for her husband.
When the trial judge expressed his concern at having to make a difficult decision that, in effect, would destroy the child's relationship with one of the natural parents, the responses of respective counsel for both the mother and the father made it very clear that the choice was between Madison, Florida and Fort Bragg, North Carolina. The argument of counsel for the mother below was that "there's nothing more deadening to a child than growing up in a small town" and that "there's no substitute for a (natural) mother's care." Although the majority of this court apparently agrees with that latter argument, it contravenes the public policy of Florida as expressed by the legislature in section 61.13(2)(b)1, Florida Statutes (1989):
(b)1. The court shall determine all matters relating to custody of each minor child of the parties in accordance with the best interests of the child and in accordance with the Uniform Child Custody Jurisdiction Act. It is the public policy of this state to assure that each minor child has frequent and continuing contact with both parents after the parents separate or the marriage of the parties is dissolved and to encourage parents to share the rights and responsibilities of childrearing. After considering all relevant facts, the father of the child shall be given the same consideration as the mother in determining the primary residence of a child irrespective of the age of the child.
The majority opinion faults the trial judge's finding that the mother's removal of the minor child to Fort Bragg, North Carolina, was "on a permanent basis." Aside from the mother's testimony that Fort Bragg was a "permanent assignment," her own trial counsel argued that the trial judge should order "the permanent transfer of the child out of the State of Florida or to any other place that the Sergeant is transferred to duty." The trial *314 court interpreted the original judgment's provision in regard to "removal on a permanent basis" to be based on the physical relocation of the child for an extended and indefinite period  as, apparently, did the mother's trial counsel. The trial court's interpretation of that provision squares with common sense and the obvious intent of the provision in the original judgment. The interpretation of the word "permanent" urged by the majority constitutes an unpersuasive attempt to intermingle apples and oranges  physical residence and legal domicile. Those are two different things, as explained in Brown v. Brown, 123 So.2d 382 (Fla. 2d DCA 1960).
In point of fact, the trial judge did not focus primarily on the duration of the removal of the child, but on what he perceived to be the best interest of the child, which is candidly conceded on the first page of the appellant's brief: "At the outset of the case, the trial judge made a determination that it really made no difference whether or not Appellant's present residence in North Carolina was either temporary or permanent. What mattered, said the judge, was the present and future best interest of the minor child."
The burden of discretionary decision-making imposed upon a trial judge in custody cases is a heavy one. As Cardozo suggests, the exercise of that discretion should be "informed by tradition," which is inculcated in established case law. One fundamental tenet of that case law is that appellate courts should only review matters first presented to the trial court. Osterndorf v. Turner, 426 So.2d 539, 547 (Fla. 1982); Dober v. Worrell, 401 So.2d 1322 (Fla. 1981). Another fundamental tenet is that appellate courts should exercise restraint in interfering with the custody determination of a trial judge. See Iannone v. Iannone, 542 So.2d 487 (Fla. 5th DCA 1989). As we said in that case:
The broad discretion given a trial judge in these most-difficult cases is based upon sound case law, Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980), and common sense. The trial judge has a much better perspective on these matters, with historical knowledge, the witnesses in view, the testimony before him and the experience behind him.
The two aforesaid tenets have fallen victim in this case to the majority's innovative rejection of the trial judge's discretionary decision. Or, in the words of Robert Bork: "This results-first, premises-to-follow form of legal `reasoning' is to law what Robert Frost called free verse, `tennis with the net down.' There are no rules, only passions."[3] The majority, in their passion for a reversal, have removed the net and the rules.
I would affirm.
DAUKSCH, COWART and GOSHORN, JJ., concur.
NOTES
[1] This ground will be discussed no further since there was no evidence presented to establish it and the trial court made no finding in support of it. Additionally, because the parenting skills are not alleged to have changed since the property settlement agreement and the final judgment granting the dissolution, it would not be a proper ground for modification in any event.
[2] This denial has caused much discussion among the members of the court as to the current validity of Cole v. Cole, 530 So.2d 467 (Fla. 5th DCA 1988), motion granted, 535 So.2d 355 (Fla. 5th DCA 1988); Jones v. Vrba, 513 So.2d 1080 (Fla. 5th DCA 1987); and Giachetti v. Giachetti, 416 So.2d 27 (Fla. 5th DCA 1982). However, the denial of the mother's petition was not appealed and thus neither it nor a review of the above cited cases is properly before us.
[3] Both the mother and her new husband testified that they considered Florida their home and intended to return as soon as the husband's commitment to the service permitted it. Further, the mother considered her permanent residence as that of her mother's in Florida and maintained her Florida driver's license and continued her voter registration in this state.
[1] The trial judge candidly said at the end of the hearing:

THE COURT: Let me interrupt you again. I went [sic] to get it for the Record, something bothers me. Can I take into consideration grandparents might have wanted to visit this child? Let me start that over. Nowhere that's been presented to me have I had a grandmama or a granddaddy who lives here in the State of Florida come to me and say Judge, we would like the child here because then we would be able to see him more often than once every ten months or an aunt or these things that your client made reference to about the family relationship. As far as I know, none of them want to see the child because nome [sic] of them came in here and told me they wanted to see this child.
MS. VITTER [Counsel for Mast]: I think that Mrs. Mast indicated that on a couple of occasions that Mr. Reed's mother had picked the child up. That's a period of time the mother  grandmother has seen the child.
THE COURT: You miss my point. No one told me they wanted to see the child.
MS. VITTER: I understand what you're saying.
THE COURT: He could have hired her to go down there just like he could hire anybody else to go down there.
Okay. Go ahead.
[2] After reviewing Reed's financial records and hearing his testimony, the trial judge declared that Reed really does not have "any income" at this time.
[3] Kuntz v. Kuntz, 464 So.2d 1349 (Fla. 1st DCA 1985).
[4] Nissen v. Murphy, 528 So.2d 502 (Fla. 2d DCA 1988); In re E.P., 186 So.2d 801 (Fla. 3d DCA 1966).
[5] Mehler v. Mehler, 555 So.2d 1295 (Fla. 3d DCA 1990); Parker v. Parker, 519 So.2d 673 (Fla. 1st DCA 1988); Giachetti v. Giachetti, 416 So.2d 27 (Fla. 5th DCA 1982).
[6] See Zediker v. Zediker, 444 So.2d 1034 (Fla. 1st DCA 1984); McGregor v. McGregor, 418 So.2d 1073 (Fla. 5th DCA 1982); Robinson v. Robinson, 333 So.2d 526 (Fla. 2d DCA 1976).
[7] Bennett v. Bennett, 73 So.2d 274 (Fla. 1954); Iannone v. Iannone, 542 So.2d 487 (Fla. 5th DCA 1989) (Sharp, W., J., dissenting); Crippen v. Crippen, 508 So.2d 1339 (Fla. 4th DCA 1987); Culpepper v. Culpepper, 408 So.2d 782 (Fla. 2d DCA 1982); Stricklin v. Stricklin, 383 So.2d 1183 (Fla. 5th DCA 1980).
[8] See Britt v. Shovein, 559 So.2d 749 (Fla. 4th DCA 1990); McIntyre v. McIntyre, 452 So.2d 14 (Fla. 1st DCA 1984).
[9] Kantor v. Kantor, 545 So.2d 1378 (Fla. 4th DCA 1989) (Glickstein, J., concurring); Parker v. Parker, 519 So.2d 673 (Fla. 1st DCA 1988) (Smith, J., dissenting); Jones v. Vrba, 513 So.2d 1080 (Fla. 5th DCA 1987); Adams v. Adams, 477 So.2d 16 (Fla. 1st DCA 1985); Warren v. Warren, 475 So.2d 736 (Fla. 2d DCA 1985); Costa v. Costa, 429 So.2d 1249 (Fla. 4th DCA 1983).
[10] Giachetti, Jones and Cole so far, have primarily impacted women by preventing former wives and mothers with primary residential custody of children from leaving the state, or forcing them to surrender primary residential custody. In the past, mothers were most often given primary custody. However, under Florida's dissolution law, fathers and husbands have equal claim to child custody (section 61.13, Florida Statutes (1989)), and we are reviewing and affirming a substantial number of cases awarding fathers primary residential custody. Thus, fathers and former husbands with primary custody, who have legitimate needs to leave Florida, will also be impacted by Giachetti, Jones, and Cole. In sum, I do not see this as a "feminist" issue so much as a serious family law issue. However, I doubt this court would have reached the same conclusion to start with if the custodial parent had been the father, seeking to relocate after being offered a superior job in another state, or after being assigned to a post out-of-state by the military forces.
[11] See McIntyre v. McIntyre, 452 So.2d 14, 21 (Fla. 1st DCA 1984). In 1985, there were a total of 88,425,000 occupied units (56,145,000 by owners; 32,280,000 by renters) in the United States. Within the preceding 12 months a total of 16,830,000 (4,664,000 by owners; 12,166,000 by renters) moves had occurred. Statistical Abstract of the United States, 1989 (109th Ed.), U.S. Dept. of Commerce, Bureau of Census, Table 1244 at 707. This constitutes approximately 20%, or 1 in 5 families changing household residences for that period.
[12] As Judge Letts observed, intrastate moves inside Florida could well disrupt frequent visitation for noncustodial parents and may require modification of custody decrees regarding visitation rights. See DeCamp v. Hein, 541 So.2d 708 (Fla. 4th DCA), rev. denied, 551 So.2d 461 (Fla. 1989). See also Cook v. Voth, 522 So.2d 899 (Fla. 2d DCA), rev. denied, 531 So.2d 1355 (Fla. 1988); Zediker v. Zediker, 444 So.2d 1034 (Fla. 1st DCA 1984); McGregor v. McGregor, 418 So.2d 1073 (Fla. 5th DCA 1982).
[1] In point of fact, the result reached by the majority opinion is one that gives the child of the parties less stability and insulation from parental conflict than either of the solutions urged by the parties below.
[2] There was testimony that the mother had thwarted the father's visitation on a number of occasions. In this respect, see section 61.13(3)(a), Florida Statutes (1989), which provides that for purposes of determining primary residence and the best interests of a child, an evaluation will include a determination as to which parent would be more likely to allow a child frequent and continuing contact with a nonresidential parent.
[3] Robert H. Bork, The Tempting of America, The Political Seduction of the Law, p. 264.