621 So.2d 417 (1993)
Dee Ann MIZE, Petitioner,
v.
Danny Wade MIZE, Respondent.
No. 79256.
Supreme Court of Florida.
July 1, 1993.
*418 Brenda Lee London, Maitland, for petitioner.
Jack A. Nants, Orlando, for respondent.
PER CURIAM.
We have for review Mize v. Mize, 589 So.2d 959 (Fla. 5th DCA 1991), based on conflict with cases from other district courts of appeal.[1] We quash Mize.
Dee Ann and Danny Mize were divorced in 1985, after six years of marriage. The final judgment of dissolution awarded primary physical residence of the couple's minor daughter, Lauren, age two, to Dee Ann, with reasonable visitation rights for Danny. A subsequent order granted Danny visitation privileges on alternate weekends, and further provided that "[b]oth parties *419 are expressly forbidden to move [the child] from the State of Florida without the express permission of this Court." Dee Ann petitioned the court in 1990 for permission to move with Lauren, then seven years old, to California, claiming that Danny was in arrears in child support payments, that she had received an offer of employment in California that would increase both her rate of pay and her potential for promotion, and that her father, the child's maternal grandfather, lives there and would provide support. Danny opposed the move and sought primary physical residence.
Following trial, a special master recommended that Dee Ann's petition be granted. The special master noted the following: Dee Ann provided a loving and stable home for the child; Dee Ann's economic circumstances would be improved by the move; the child's domestic and educational environments would be improved; Dee Ann and the child would both benefit from increased contact and support of the maternal grandfather; and Dee Ann is amenable to arranging extensive alternative visitation and will pay transportation costs. The special master's report was adopted by the trial court. The district court reversed, ruling that to allow the child to be permanently removed from Florida would be contrary to its precedent discouraging removal.
Florida law presumes that parents will share in decisionmaking about their children even though the parents are no longer married. Section 61.13(2)(b), Fla. Stat. (1989). Thus, although one parent may have primary residential responsibility for a child, the law seeks to assure that the child have "frequent and continuing contact" with both parents and that parental responsibility for the child be shared. Id.[2]
Both Florida courts[3] and courts throughout the country[4] have had difficulty determining when a primary residential parent may move a child from a particular area. Unfortunately, there is no way to fashion a bright-line rule for determining when a move that will geographically separate a child from one of his or her parents is permissible. There are an infinite number of situations that must be evaluated in light of the best interests of the families involved. However, trial judges need some direction in making that determination.
Accordingly, we adopt the approach articulated in Hill v. Hill, 548 So.2d 705 (Fla. 3d DCA 1989), review denied, 560 So.2d 233 (Fla. 1990). As Judge Schwartz stated:
[S]o long as the parent who has been granted the primary custody of the child desires to move for a well-intentioned reason and founded belief that the relocation is best for that parent's  and, it follows, the child's  well-being, rather than from a vindictive desire to interfere with the visitation rights of the other parent, the change in residence should ordinarily be approved.
*420 548 So.2d at 707-08 (Schwartz, J., specially concurring) (footnotes omitted). However, Judge Schwartz recognized that circumstances may exist that would justify a departure from the general rule. 548 So.2d at 708 n. 3. For example, when older children are involved, the trauma of leaving friends, other family members, and school may outweigh the trauma in separating from the primary residential parent. See id. Thus, in making the ultimate decision, trial courts must consider and weigh factors discussed by Judge Nesbitt, such as:
1. Whether the move would be likely to improve the general quality of life for both the primary residential spouse and the children.
2. Whether the motive for seeking the move is for the express purpose of defeating visitation.
3. Whether the custodial parent, once out of the jurisdiction, will be likely to comply with any substitute visitation arrangements.
4. Whether the substitute visitation will be adequate to foster a continuing meaningful relationship between the child or children and the noncustodial parent.
5. Whether the cost of transportation is financially affordable by one or both of the parents.
6. Whether the move is in the best interests of the child. (This sixth requirement we believe is a generalized summary of the previous five.)
548 So.2d at 706;[5]see also Mast v. Reed, 578 So.2d 304, 311 (Fla. 5th DCA 1991) (Sharp, J., concurring in part, dissenting in part) (discussing similar factors). However, in cases where the final judgment incorporates a prohibition against the relocation of the child thereby reflecting that the issue was litigated, the parent with the primary residential responsibility must show a change of circumstances in order to justify the relocation.
In all cases of this type, the best interest of the child clearly is the prime consideration. See Department of Health and Rehabilitative Services v. Privette, 617 So.2d 305 (Fla. 1993).
This issue presents an impossible problem for the children, the parties, and the courts. We hope society continues to move toward an alternative means of resolving these types of conflicts that will better serve parties than does the adversarial system. In the meantime, we believe the approach taken by the judges in Hill best serves both the parties and the courts.
We quash the decision of the district court and remand for reconsideration in light of our present opinion. Because Danny Mize argued on review before this Court only against removal of the child and did not seek primary residency, he has abandoned any separate residency claim. On remand, only the removal issue will be addressed.
It is so ordered.
OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
BARKETT, C.J., concurs with an opinion.
SHAW, J., concurs in result only with an opinion.
BARKETT, Chief Justice, concurring.
Justice Shaw suggests that the test established in the majority opinion is limited to Judge Schwartz's statement in Hill v. Hill, 548 So.2d 705, 707-08 (Fla. 3d DCA 1989) (Schwartz, J., specially concurring), review denied, 560 So.2d 233 (Fla. 1990). I write separately to emphasize that the test of the majority incorporates all relevant factors, including those outlined by Judge Nesbitt in Hill. Majority op. at 420.
Moreover, notwithstanding Justice Shaw's view to the contrary, the majority opinion specifically acknowledges the Legislature's determination that the best interests of children are served by frequent and continuing contact with both parents. § 61.13(2)(b), Fla. Stat. (1989). Majority op. at 419. This is a view which I enthusiastically *421 endorse. Indeed, as a circuit judge, I participated actively and directly in drafting the language of this statute to help assure the frequent and continuing contact of children with both of their parents.
The public policy articulated by the statute without question represents the ideal arrangement. However, in today's increasingly mobile society, parents are going to have legitimate needs to relocate. As one commentator has noted:
The cooperative custody system is based on the social value of the child's continuing relationship with both parents after divorce. Its premise is that a child is more likely to benefit if the state encourages divorced parents to work together in a parental capacity than if the state delegates control of the child to one of them.
This fundamental belief, however, must contend with the realities of life in a mobile society that values personal and parental autonomy.
Andrew Schepard, Taking Children Seriously: Promoting Cooperative Custody After Divorce, 64 Tex.L.Rev. 687, 780 (1985). See also Mandy S. Cohen, Note, A Toss of the Dice ... The Gamble with Post-Divorce Relocation Laws, 18 Hofstra L.Rev. 127, 127 (1989) ("Traditional state control of family law has bowed to the need for uniformity induced by `the practical demands of a mobile society in today's shrinking world.'") (quoting McIntyre v. McIntyre, 452 So.2d 14, 21 (Fla. 1st DCA 1984)).
Even when parents stay married, conflicts arise concerning one spouse's desire to relocate or need to commute long distances for work. The role of the courts in cases involving divorced parents should not be to impose restrictions on one parent's ability to move, but to urge the parents to seek a mutually acceptable solution for the best interests of their children. As Professor Schepard notes, it is far better to resolve these issues through mediation than through the adversarial process:
If the parents had not divorced they would have negotiated with each other about proposed relocations. Mediation requires them to undertake that same negotiation with the help of a neutral party. The neutral party is necessary because the forces that encourage married parents to compromise with each other have been weakened by divorce, and the neutral party reminds them of their continuing joint interest in the welfare of their child.
Schepard, 64 Tex.L.Rev. at 782.
In the vast majority of cases parents truly are concerned about the best interests of the children and, with some encouragement, will reach a solution that satisfies those interests. Sadly, the adversarial system, which too often fosters hostility and bitterness, frequently prevents parents from engaging in the types of discussions that are necessary to reach a mutually acceptable arrangement.
As the majority notes, I am hopeful that society will continue to move toward an alternative means of resolving these impossible conflicts.
SHAW, Justice, concurring in result only.
The majority today adopts the approach articulated by Judge Schwartz in Hill v. Hill, 548 So.2d 705 (Fla. 3d DCA 1989), review denied, 560 So.2d 233 (Fla. 1990):
[S]o long as the parent who has been granted the primary custody of the child desires to move for a well-intentioned reason and founded belief that the relocation is best for that parent's  and, it follows, the child's  well-being, rather than from a vindictive desire to interfere with the visitation rights of the other parent, the change in residence should ordinarily be approved.
Id. at 707-08 (Schwartz, C.J., concurring) (footnotes omitted). Under this rule, which equates the child's well-being with that of one parent (i.e., the custodial parent), the relocating parent's petition ordinarily must be granted whenever that parent professes a good faith reason for moving.
While this ultra-liberal standard for removal may impose a degree of predictability on this otherwise confused area of law, it does so at a substantial price. This *422 virtual per se rule favoring removal denigrates the rights of Florida's noncustodial parents and directly violates our Legislature's clear statement of public policy equating the child's best interests with optimum involvement by both parents:
The court shall determine all matters relating to custody of each minor child of the parties in accordance with the best interests of the child.... It is the public policy of this state to assure that each minor child has frequent and continuing contact with both parents after the parents separate or the marriage of the parties is dissolved and to encourage parents to share the rights and responsibilities of childrearing.
§ 61.13(2)(b)1, Fla. Stat. (1989).

I. FREQUENT AND CONTINUING CONTACT
At common law, residence restrictions on children of dissolved marriages were unnecessary because the father was granted full custody as a matter of course.[6] With the ascendancy of the women's rights movement in the nineteenth and twentieth centuries, however, the preference for fathers gave way to a preference for mothers. The "tender years" doctrine held that women are uniquely gifted to meet the psychological and emotional needs of the young.[7] The equal rights movement of this century led courts to reassess this view and recognize that fathers too are capable of caring for young. This recognition, when combined with the publication of psychological studies emphasizing the importance of both parents in the rearing of children, prompted states to pass joint custody legislation.[8]
The move toward joint custody in Florida led to the Dissolution of Marriage Act of 1971,[9] which substantially increased the father's right to custody and visitation, and the Shared Parental Responsibility Act of 1982,[10] which is codified in chapter 61, Florida Statutes (1989), and provides in part:
[61.13(2)](b)1. The court shall determine all matters relating to custody of each minor child of the parties in accordance with the best interests of the child... . It is the public policy of this state to assure that each minor child has frequent and continuing contact with both parents after the parents separate or the marriage of the parties is dissolved and to encourage parents to share the rights and responsibilities of childrearing... .
2. The court shall order that the parental responsibility for a minor child be shared by both parents unless the court finds that shared parental responsibility would be detrimental to the child....
... .
b. The court shall order sole parental responsibility, with or without visitation rights, to the other parent when it is in the best interests of the minor child.
§ 61.13, Fla. Stat. (1989). Under this statute, it is presumed that both parties to a dissolution will thereafter share jointly in deciding important issues and assuming major responsibilities of childrearing. The benefits of joint custody, or shared parental responsibility, are beyond dispute.[11]
In addition to joint custody, the statute calls for "frequent and continuing contact *423 with both parents." This emphasis on frequency of visitation is of crucial importance in removal cases, where increased geographic separation often necessitates less frequent visits of longer duration for the noncustodial parent. Our policy favoring frequent visitation is grounded in widely recognized social and psychological data, as summarized by Justice Schreiber of the New Jersey Supreme Court:
Professor Biller states that "investigators point out the importance of frequent" father-child visiting patterns. Biller, "Father Absence, Divorce, and Personality Development," in M. Lamb, supra, at 527 (emphasis added). Kurdek and Berg list the extent of "regular visitation by the noncustodial parent" as an important predictor of children's adjustments to their parents' divorce. Kurdek & Berg, "Correlates of Children's Adjustment to Their Parents' Divorces," in Children and Divorce 50 (Kurdek ed. 1983) (emphasis added). Dr. Gardner, a psychiatrist, when asked to testify about optimal visitation arrangements, states that "shorter, more frequent visitations [with the noncustodial parent] are preferable to fewer, longer ones." R. Gardner, Psychotherapy with Children of Divorce 379 (1976). Rogers & Long found that boys whose fathers were out of town for long periods of time had more difficulties in their sexual identification and development than boys who saw their fathers regularly. Rogers and Long, "Male Models and Sexual Identification: A Case from the Out Island Bahamas," 27 Human Organization 326-31 (1958). Wallerstein and Kelly found that "[i]n the youngest children the good father-child relationship was closely related to a regular and frequent visiting schedule and to a visiting pattern that included continuity and pleasure in the visiting. For most children, this meant overnight and weekend stays." J. Wallerstein & J. Kelly, [Surviving the Breakup: How Children and Parents Cope with Divorce 219 (1980)] (emphasis added). The authors also found that "infrequent visiting pattern[s]" had an adverse impact on children's academic performance, id. at 283, and noted a correlation between infrequent visits from the father and depression among young boys, id. at 172. In sum, the social science literature is virtually unanimous in stressing the importance to children of regular, frequent contact with both their parents and in recommending that children's relationships with their noncustodial parents not be lightly disturbed or frustrated.
Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606, 622-23 (1984) (Schreiber, J., concurring).
Thus, under our statutory scheme, parental rights in post-dissolution settings consist of three components  custody, residence, and visitation  which are governed by policies favoring shared parental responsibility and frequent and continuing contact between the child and both parents. While actual custody is rarely in dispute in removal cases, primary physical residence and visitation often are.
Florida's district courts generally use a two-pronged test for determining when a custodial parent has a legal right to remove a child: The custodial parent must show that the move is prompted by a substantial change in circumstances and is in the child's best interests.[12] In applying this test, unfortunately, our courts are in disarray,[13] as are courts throughout the nation.[14] Accordingly, I would set forth the following guidelines.

*424 II. PROPOSED STANDARD FOR REMOVAL
Because a custodial parent's effort to remove a child from a particular geographical area[15] has the same practical effect as a petition to alter the visitation provision of the original decree, I would hold that whenever removal is formally challenged by a noncustodial parent the custodial parent must show that the move is prompted by a substantial change in circumstances and is consistent with the child's best interests.
In meeting this burden, the custodial parent may establish a substantial change in circumstances by showing that the move is based on reasonable grounds. Vague and insubstantial reasons are unacceptable.[16] Convincing and determinate reasons, on the other hand, are presumptively adequate.[17] To establish that the move is consistent with the child's best interests, the parent may present evidence showing that the child will not be substantially harmed by the move. Once the custodial parent has made his or her initial showing, the court will then evaluate the best interests of the child by assessing the motives for,[18] and impact of, the move on all parties, including the child,[19] the custodial parent,[20] and the *425 noncustodial parent.[21] Where the noncustodial parent has exercised extensive visitation and decisionmaking rights and nurtured a positive, loving relationship with the child, this will be given great weight.
Because the custodial parent has been judicially determined to be best suited to provide for the residential needs of the child, every effort should be made to keep the primary physical residence of the child intact with that parent. Thus, where the custodial parent demonstrates convincing reasons for a move,[22] permission for removal ordinarily should be granted. Whenever possible the court must provide for a reasonable and realistic alternative visitation schedule, in keeping with the Legislature's determination that the best interests of the child are served through shared parenting and maintaining frequent and continuing contact with both parents.

III. CONCLUSION
The majority's liberal standard favoring removal will work no inequity in those cases where the noncustodial parent has failed to exercise decisionmaking and visitation rights or has done so in a negative manner. However, where the noncustodial parent has exercised extensive parenting and visitation rights, perhaps at great personal sacrifice, and has worked hard to create a loving bond with the child, the majority opinion will invite clear injustice  as well as immeasurable heartbreak  for that parent and child, in case after case within our state. To my mind, when a parent is granted the great benefits of primary physical residence he or she may reasonably be expected to shoulder the responsibilities as well, and this may at times include reasonable geographical limitations during the child's minority.
Half a century ago in Fields v. Fields, 143 Fla. 886, 890, 197 So. 530, 531 (1940), this Court embraced the then-popular "tender years" doctrine, ruling: "Other things being equal ... the mother of infants of tender years [is] best fitted to bestow the motherly affection, care, companionship, and early training suited to their needs." Today's majority opinion is a throwback to those days  in fact, today's opinion actually expands the "tender years" doctrine to hold that the convenience of the custodial parent is tantamount to the best interests of the child. This mindset ignores virtually the entire weight of social and psychological data in the intervening half century, summarized above, which indicates that the interests of the child are best served by *426 shared parenting and "frequent and continuing contact with both parents"  a fact long recognized by our Legislature.
NOTES
[1] E.g., Hill v. Hill, 548 So.2d 705 (Fla. 3d DCA 1989), review denied, 560 So.2d 233 (Fla. 1990); Bachman v. Bachman, 539 So.2d 1182 (Fla. 4th DCA 1989); Nissen v. Murphy, 528 So.2d 502 (Fla. 2d DCA 1988); McIntyre v. McIntyre, 452 So.2d 14 (Fla. 1st DCA 1984). We have jurisdiction pursuant to article V, section 3(b)(3) of the Florida Constitution.
[2] Courts' positions on custody matters have evolved significantly over the years. Compare Busbee v. Weeks, 80 Fla. 323, 325, 85 So. 653, 653 (1920) ("At common law the father has the paramount right to the custody and control of his legitimate minor children... .") with Fields v. Fields, 143 Fla. 886, 890, 197 So. 530, 531 (1940) ("Other things being equal ... the mother of infants of tender years [is] best fitted to bestow the motherly affection, care, companionship, and early training suited to their needs.") (quoting Gayle v. Gayle, 220 Ala. 400, 125 So. 638, 639 (1930)). In the latter half of this century, courts and legislatures began to recognize that both parents should play a role in caring for children, even if the parents no longer live together. See Paul S. Quinn, Jr., Note, Shared Parental Responsibility and Residence Restrictions in Florida, 38 U.Fla.L.Rev. 117, 121 (1986); see also ch. 71-241, Laws of Fla.; ch. 82-96, Laws of Fla.
[3] As Judge Sharp has noted: "This state's reporter system contains a bewildering array of decisions wrestling with the review of trial court orders which permit, or refuse to permit, a custodial parent to leave Florida with a minor child or children." Mast v. Reed, 578 So.2d 304, 309 (Fla. 5th DCA 1991) (Sharp, J., concurring in part, dissenting in part).
[4] See, e.g., In re Marriage of Eckert, 119 Ill.2d 316, 116 Ill.Dec. 220, 518 N.E.2d 1041 (1988); In re Marriage of Frederici, 338 N.W.2d 156 (Iowa 1983); Yannas v. Frondistou-Yannas, 395 Mass. 704, 481 N.E.2d 1153 (1985); Auge v. Auge, 334 N.W.2d 393 (Minn. 1983); Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988); Weiss v. Weiss, 52 N.Y.2d 170, 436 N.Y.S.2d 862, 418 N.E.2d 377 (1981).
[5] The test as stated by Judge Nesbitt in the majority opinion evolved from caselaw in Florida's Third and Fourth District Courts of Appeal, as well as from New Jersey cases. Hill v. Hill, 548 So.2d at 706.
[6] See Busbee v. Weeks, 80 Fla. 323, 325, 85 So. 653, 653 (1920) ("At common law the father has the paramount right to the custody and control of his minor children... .").
[7] See Fields v. Fields, 143 Fla. 886, 890, 197 So. 530, 531 (1940) ("Other things being equal ... the mother of infants of tender years [is] best fitted to bestow the motherly affection, care, companionship, and early training suited to their needs.").
[8] See Paul S. Quinn, Jr., Note, Shared Parental Responsibility and Residence Restrictions in Florida, 38 U.Fla.L.Rev. 117, 121 (1985).
[9] Ch. 71-241, Laws of Fla.
[10] Ch. 82-96, Laws of Fla.
[11] See, e.g., Paula M. Raines, Joint Custody and the Right to Travel: Legal and Psychological Implications, 24 J.Fam.L. 625, 627-28 (1985-86) ("Virtually all empirical psychological research in the current literature substantiates the proposition that where the parents are suited to joint custody, the continuing contact, support, guidance and control of both parents subsequent to a divorce serves the best interests of the children.").
[12] See, e.g., Crippen v. Crippen, 508 So.2d 1339 (Fla. 4th DCA 1987); Culpepper v. Culpepper, 408 So.2d 782 (Fla. 2d DCA 1982); Stricklin v. Stricklin, 383 So.2d 1183 (Fla. 5th DCA 1980).
[13] See, e.g., Ferguson v. Baisley, 593 So.2d 319, 320 (Fla. 4th DCA 1992) (Anstead, J., dissenting) ("[T]he legal standards to be applied by a trial court asked to allow a move, are in a state of confusion."); Mast v. Reed, 578 So.2d 304, 309 (Fla. 5th DCA 1991) (Sharp, J., concurring in part, dissenting in part) ("[The] appellate decisions are all over the map... .").
[14] While some states permit removal for virtually any good faith reason, others allow it only under exceptional circumstances, and still others follow a middle course. See, e.g., In re Marriage of Eckert, 119 Ill.2d 316, 116 Ill.Dec. 220, 518 N.E.2d 1041 (1988); In re Marriage of Frederici, 338 N.W.2d 156 (Iowa 1983); Yannas v. Frondistou-Yannas, 395 Mass. 704, 481 N.E.2d 1153 (1985); Auge v. Auge, 334 N.W.2d 393 (Minn. 1983); Holder v. Polanski, 111 N.J. 344, 544 A.2d 852 (1988); Weiss v. Weiss, 52 N.Y.2d 170, 436 N.Y.S.2d 862, 418 N.E.2d 377 (1981). See also Mandy S. Cohen, Note, A Toss of the Dice ... The Gamble with Post-Divorce Relocation Laws, 18 Hofstra L.Rev. 127 (1989).
[15] Although the present case involves a petition to remove the child from the state, many removal cases involve far smaller geographical areas, such as judicial circuits or counties. See, e.g., Hill v. Hill, 548 So.2d 705 (Fla. 3d DCA 1989) (notice required prior to removal from "the area"), review denied, 560 So.2d 233 (Fla. 1990); Costa v. Costa, 429 So.2d 1249, 1250 (Fla. 4th DCA 1983) (permission required prior to removal from Broward or Palm Beach counties). The above analysis is applicable whenever removal from a geographical area will have a substantial impact on the visitation rights of the noncustodial parent.
[16] Such reasons include but are not limited to the following: a speculative or marginally improved employment prospect, a more salutary geographical climate, or enhanced social opportunities for the parent.
[17] Convincing reasons include but are not limited to the following: a mandatory transfer at a long-held job for the custodial parent or new spouse of that parent, a firm and greatly enhanced employment opportunity for the custodial parent, a unique and exceptional financial or educational opportunity for the custodial parent, bona fide health or medical concerns of the parent or child, to escape long-term abuse or harassment from an embittered noncustodial ex-spouse, or where a custodial parent has remarried and has had children with the new spouse and the new spouse demonstrates a legitimate reason for moving.
[18] Many postdivorce moves are motivated not by a desire to improve the circumstances of the child or custodial parent but simply to put geographic distance between ex-spouses. See Raines, supra note 11, at 647 ("[F]orty percent of both men and women surveyed stated that an overriding consideration, when deciding to leave the marital community, was a desire to create more geographic distance between themselves and their former spouses.").
[19] The court may consider, but is not limited to considering, the following:

 The age, gender, and developmental stage of the child.
 The length of time the child has resided in the present home.
 The extent of the disruption caused by the move on the child's social, educational, and emotional development.
 The individual child's ability to deal with the disruption of the move.
 The nature and quality of the child's relationship with the noncustodial parent and the extent to which that relationship will be altered by the move.
 Whether mutual conflict between the parents exists and has adversely affected the child. Whether this will be lessened by the move.
 The preference of the child, to the extent he or she is mature enough to express a reasonable opinion.
 The extent to which the child's social, economic, educational, or physical development will be benefited by the move.
[20] The court may consider, but is not limited to considering, the following:

 Whether the custodial parent has engaged in a sustained effort to alienate the child from the other parent.
 Whether the custodial parent has engaged in a pattern of denying or frustrating the noncustodial parent's visitation rights.
 Whether the underlying purpose of the move is to defeat visitation.
 Whether the custodial parent is amenable to formulating a realistic and reasonable alternative visitation schedule.
 Whether the custodial parent will be likely to comply with visitation once out of the community.
 Whether the custodial parent has remarried and the move is prompted by legitimate obligations of the new spouse. Whether denial of permission to remove the child will cause a breakup in the new family.
 To the extent the move is based on an employment opportunity, the firmness and quality of the opportunity. Whether a higher cost of living in the new location will offset any increase in pay. Whether the custodial parent or new spouse of that parent has looked for similar or alternative jobs in the present community.
 Whether the custodial parent has relatives or close friends in the new location capable of providing economic or emotional support for the parent or child.
 The extent to which the proposed move will benefit the custodial parent in terms of economic, educational, or social opportunities, or health requirements.
[21] The court may consider, but is not limited to considering, the following:

 Whether the noncustodial parent has engaged in a sustained effort to alienate the child from the other parent.
 Whether the underlying purpose of the attempt to block the move is to impede the residential parent's autonomy or to secure a financial advantage in future support payments.
 Whether the noncustodial parent has engaged in a pattern of abuse or harassment toward the residential parent.
 The extent to which the noncustodial parent was granted and has exercised visitation rights.
 The extent to which the noncustodial parent has shared the rights and responsibilities of childrearing.
 The nature and quality of the relationship between the noncustodial parent and child. The depth of the bond between the two.
 Whether substitute visitation will be adequate to foster a continuing and meaningful relationship between the child and noncustodial parent.
 Whether the parties can afford the transportation costs of the substitute visitation.
[22] See supra note 17.