*In re* MARRIAGE OF LORI SHELTON (now Newton), Petitioner-Appellee, and DALE SHELTON, Respondent-Appellant.

Fifth District    No. 5—90—0462

Opinion filed May 2, 1991.—Rehearing denied August 16, 1991.

CHAPMAN, J., dissenting.

James E. Schrempf, of Coppinger, Carter, Schrempf & Blaine, Ltd., of Alton, for appellant.

Rand S. Hale, of Pratt & Callis, P.C., of Granite City, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Lori Shelton (now Newton) (petitioner), the custodial parent, filed a petition to remove her minor children, Ryan and Kyle, aged 13 and 11 at the time of the hearing, with the circuit court on May 9, 1990. The circuit court granted the petitioner's removal petition. Subsequently, Dale Shelton (respondent) filed a motion to stay enforcement of the judgment, which was denied, and respondent filed his appeal of the court's order granting removal.

At the hearing on the petition for removal on June 5, 1990, the petitioner testified that she and the respondent were divorced in August 1985. After the divorce, she and the two children lived in an apartment in Brighton, Illinois, for eight or nine months. Because she was financially unable to live on her own, she and the children moved in with her parents. When she moved, the petitioner notified the respondent. She and the children lived with her parents from April 1986 until August 1989. During that time, she went to school and finished a teaching degree in 1988. After the petitioner had moved from her parents' home, her children still saw her parents almost daily.

In August 1989, the petitioner purchased a home in Wood River, Illinois, through the Federal Housing Authority by putting $1,000 down and paying mortgage payments of $418 per month. The house in Wood River had three bedrooms, so each of the children had his own room. The house was four blocks from the school the children attended, and they walked to school each day. According to the petitioner, there were no other children in the neighborhood where they lived. At present, the petitioner has put her house up for sale. The petitioner explained that she had planned on moving from this house even before the planned move to Florida, as she had been informed that her neighbor was in jail for molesting children.

In January 1990, the petitioner remarried. At the time of her marriage, her husband, David Newton, was unemployed. Her husband's skills for employment were as a certified electrician and

plumber and he also worked in heating and air conditioning. After their marriage, the petitioner's husband looked for work from St. Louis, Missouri, to Springfield, Illinois. Because her husband had injured his lower back in February 1989, he looked for an office-type job. Her husband was unsuccessful in finding a job in the area, but he succeeded in finding a job in Naples, Florida, as an ABC estimator for Boren, Craig and Barber.

At the beginning of her marriage to Newton, the petitioner supported the family. She worked as an elementary school teacher for the St. Louis public school system where she earned $17,000 per year. The petitioner testified that she had resigned from her job in May 1990, and she was currently unemployed. Her reasons for quitting her employment were that she was going to move to Florida; that the area where she was teaching was bad in that there was a "crack house" across the street from the school and when "they" got "high," "they decided to take a shotgun to the school on several occasions"; and that the school district was preparing to close her school and to lay off teachers. She explained that even if she were not moving to Florida, she would have resigned from her job. She stated that she had planned on substitute teaching in area schools until she found a job. The petitioner testified that she had had applications for full-time teaching positions in the area schools ever since she had graduated from school. When asked what she would do if she were not granted permission to remove the children to Florida, the petitioner stated that she would have to find a job at "Wal-mart" or something of that nature.

The petitioner further testified that she and her husband had gone to Florida in April 1990. At that time, the petitioner and her husband rented a three-bedroom home on a month-to-month basis in Cape Coral, Florida, for $600 per month, and thus, each of her children still had his own bedroom. This home was six blocks from the school which her children would attend. To get to the school, her children would have to ride their bicycles to the end of the block and then catch the school bus. The school was in a nice area and was new. There were other children living in the neighborhood where they were to live. While she and her husband were in Florida, the petitioner applied for work at schools in the Cape Coral-Ft. Myers area. The petitioner had applied previously for teaching jobs in Florida in 1988 when she had graduated from college. She was aware that two new schools were being built in Naples, and that the schools would be hiring teachers; however, she had not yet applied for employment there. When she had investigated possible

teaching jobs in April, she found out that the starting salary for teachers was $24,000 per year.

The petitioner admitted that in the summer of 1989, she took the children to Minnesota for eight weeks. She told the respondent she was going to do this. She further admitted that the respondent did not like her taking the children to Minnesota, but that he agreed that the children could go.

The petitioner also testified that she currently drove a 1986 Dodge Aries. Her husband drove a 1989 Ford truck which was purchased in April 1990.

The petitioner stated that the respondent's payment of child support was sometimes irregular. According to the petitioner, the respondent's right to visitation was every other weekend from 6 p.m. on Friday to 6 p.m. on Sunday, and that the respondent regularly exercised his visitation rights. The petitioner was aware that approximately one of the respondent's weekends per month, her sons spent the weekend at the respondent's parents' farm. In the summer, her children's visits at the respondent's parents' home were more frequent. She believed that her sons had a good relationship with the respondent's parents as well as with her own parents.

The respondent testified that he was currently employed as a site superintendent for Mega Homes. His wife, to whom he had been married for two years, worked as a physical therapy assistant. He stated that he tries to see his children as much as possible, and that he has a good relationship with his sons. He also stated that he paid $300-per-month child support.

The respondent admitted that from December through February, his parents would pick his children up for visitation as he refereed basketball on Friday nights. He would then pick his children up on Saturday morning. He also stated that many times during the summer his parents would pick his children up and take them to their farm to stay for the weekend. His parents' farm was a two-bedroom home, and his parents also had a meat-processing plant on the premises. His brother, who has four children, sold seed goods on his parents' property. His brother's children often stayed with his sons at his parents' farm.

When questioned about his activities with his children, the respondent answered that he takes them to ball games and he plays catch with them, but that his philosophy was that he was not an entertainer. The respondent stated that he tries to treat his children as though they were there all the time. He said that the children

"help me mow the yard, clean trucks up. For Mom and Dad we do chores."

The respondent attempted to show that the petitioner tried to frustrate his visitation rights. He testified that he was unaware of the petitioner's move from Brighton to her parents' home, and when he went to pick his children up for visitation, he was unable to find them. The respondent conceded that the petitioner "supposedly" told his grandmother she was moving. Because his grandmother was hard of hearing, she told the respondent the petitioner had moved to Fourth Street when in actuality they had moved to Forest Street. The respondent found the petitioner the same day that he was unable to locate his children.

Additionally, the respondent testified that he did not agree that the petitioner could take his sons to Minnesota. However, he stated there was nothing he could do to prevent them from going.

The respondent admitted that he had been delinquent in paying his child support to the petitioner, and that she had taken him to court because of the arrearage of $1,700. He further admitted that the petitioner had taken him to court approximately a year after their divorce because he had had a girlfriend stay with him when his sons were visiting. The respondent lastly explained that his new wife and his sons did not get along when he was first remarried, and that it took five or six months before his sons adjusted to his new marriage.

The respondent's father, William Shelton, testified that he and his wife live on a 640-acre farm. He stated that he has seen the respondent's sons regularly since the respondent and petitioner's divorce. According to Shelton, he sees his grandsons once a month, and in the summer, they may stay for a few days at a time. He testified that his wife sometimes picks his grandsons up, and that upon occasion, the petitioner brings the children to them. When his grandsons visit him, the respondent is present "quite often." Shelton believed that his relationship with his grandsons was "not too bad," and that his son's relationship with his children was "pretty good." Shelton said that if the respondent's sons moved to Florida, the physical relationship would be lessened, but that their love for and appreciation of his grandsons would not change.

Following this hearing, the court took the matter under advisement. On June 23, 1990, the court entered its written order in which the court found that the petitioner was a credible witness; that the petitioner had established by clear and convincing evidence that her motive for moving the children was related to improving

and enhancing the family's life-style; that the general quality of life for the children and the family would improve by the resultant move; and that the move was in the best interests of the children. The court further found that the respondent's concern was his impaired visitation with his children; however, the court determined that a great majority of the respondent's visitation time was spent at his parents' home; that it was possible to alter the present visitation schedule without impairing the amount of time, both in quality and quantity, that the respondent spends with his children; and that a reasonable visitation schedule can be established which would nurture, foster, and preserve the children's relationship with the respondent and the grandparents. Further, the court determined that the ages of the children were such that the availability of transportation and the telephone diminished the potential harm imposed by the distance of the move. The court granted the petitioner leave to remove the children to Florida and established a visitation schedule whereby the respondent was to have the children for the summer commencing one week after the last day of school and ending two weeks before the fall term (with the exception that the petitioner may have the children one week during the summer upon 60 days' advance notice to the respondent); for each spring or Easter break; for each Christmas vacation, commencing on December 24 of the even-numbered years and on December 26 of the odd-numbered years; for every other Thanksgiving vacation; and for such other times upon which the parties may agree. At the hearing on the respondent's motion to stay enforcement of the judgment, the court held that the new visitation schedule was to begin as of Thanksgiving 1990.

On appeal, the respondent contends that the court's finding that the removal of the minor children to Florida was in their best interests was contrary to the manifest weight of the evidence, and that the admission of certain hearsay testimony was improper. Because of the nature of the issues, we will first address the respondent's contention that the court improperly admitted hearsay evidence at the hearing.

■■ The specific evidence which the respondent claims was erroneously admitted at trial because it was hearsay was the petitioner's testimony that her husband was employed in Florida; that her husband had unsuccessfully attempted to find employment in Illinois; that her husband had been injured; and that the teachers' salaries in Florida were $24,000. With regard to two of these allegations, *i.e.*, that her husband had unsuccessfully attempted to find

employment in Illinois and that her husband had been injured, we find that this testimony was irrelevant, and thus, the admission of this testimony, if considered hearsay, was harmless. The crucial information was that her husband was unemployed at the time of her remarriage, and that subsequently, he found employment in Florida. A further discussion of this information will be given in our following analysis of the manifest weight of the evidence issue. We next consider the remaining testimony objected to by the respondent as hearsay.

■■ With regard to the respondent's allegation that the petitioner's testimony that her husband was employed in Florida was erroneously admitted at the hearing because it was hearsay, we determine that the respondent waived this issue. As the respondent has noted, the petitioner testified on more than one occasion that her husband was employed in Naples, Florida. Our review of the record reveals that the respondent did not object to the petitioner's testimony that he was employed at any of these points where the testimony occurs. There was a hearsay objection made at one juncture by the respondent when the petitioner was asked the amount of income her husband earned in his job, and this objection was sustained by the court. However, there was no objection to the claimant's specific testimony that her husband was employed as an estimator by Boren, Craig and Barber. The respondent's objection to this testimony by the claimant comes too late on appeal, and this point is waived. *Village of Northbrook v. Steerup* (1959), 16 Ill. 2d 530, 158 N.E.2d 630.

■■ The respondent's last contention regarding inadmissible evidence is that the petitioner's testimony that the starting salary for teachers in Florida is $24,000 is hearsay. Initially, we note that this information is not crucial to this case; however, we also determine that this testimony was information of which the petitioner had personal knowledge, and therefore, the testimony was not hearsay. The petitioner testified that she applied for and investigated teaching opportunities in the Cape Coral-Ft. Myers area when she was in Florida in April 1990. During her investigation, she found out that the starting salary for a teacher was $24,000. Because of her personal investigation, she had personal knowledge of the salaries, and she could testify regarding this information.

We lastly consider the respondent's argument that the court's granting of the petitioner's petition for removal of the children to Florida as it was in the children's best interests was against the manifest weight of the evidence. The respondent argues that the

evidence did not support a finding that the quality of the children's lives will be enhanced if they are removed to Florida; that the evidence reveals that the petitioner's only motive for moving to Florida is to be with her new husband; that the respondent's motive for contesting the removal of the children is because he is a "concerned parent who wishes to maintain the close relationship he currently shares with his children"; and that the respondent will be unable to have a reasonable level of visitation with his children, and thus, the court's granting of the petition for removal was erroneous.

■ The paramount question in removal cases is whether the move is in the best interests of the children (Ill. Rev. Stat. 1989, ch. 40, par. 609), and in determining this issue, numerous factors must be evaluated. (*In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 518 N.E.2d 1041.) The factors to be considered in determining the best interests of the children are (1) the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the children; (2) the motives of the custodial parent in seeking the move, *i.e.*, is it a ruse to frustrate or defeat visitation; (3) the motives of the noncustodial parent in resisting the removal; (4) the visitation rights of the noncustodial parent; and (5) whether a realistic and reasonable visitation schedule can be reached if the move is allowed. (*In re Marriage of Eckert*, 119 Ill. 2d 316, 518 N.E.2d 1041.) A circuit court should consider these factors in determining whether the move is in the children's best interest, and this determination by the court will not be overturned on appeal unless the court's determination is clearly against the manifest weight of the evidence. *In re Marriage of Eckert*, 119 Ill. 2d 316, 518 N.E.2d 1041.

■ In the instant case, the evidence revealed that, at the time of the hearing on the petition, the petitioner had remarried. At the beginning of the marriage, the petitioner's husband was unemployed and she was the sole source of income for the family. The reason for the petitioner's husband's unemployment was not important, the fact remained that he was not employed. Subsequently, he became employed in Florida. Newton's employment cannot help but enhance his family's quality of life, for now he will be able to help his family financially. Additionally, if the petitioner should also find employment, then the Newtons will now have two incomes which will improve the quality of life for the children. Even if the petitioner should not gain employment, she will be at home for the children, and this too will enhance the quality of the children's lives. The move to Florida will significantly enhance the quality of the pe-

titioner's life, as well as the children's. Further, the petitioner did not have direct control over where her husband sought employment, so she should not be penalized by being made to choose between her new husband and her two children if her petition for removal were denied.

The other evidence presented established that the children's lifestyle in both Florida and Illinois will be comparable. In Illinois, each of the children had his own bedroom. They lived four blocks from the school they attended, and they walked to school. In their neighborhood in Illinois, there were no children. However, the petitioner did testify that she did not want to stay in their home in Wood River because she had discovered that her neighbor was in jail for child molesting. In Florida, again each child would have his own bedroom. The home in Cape Coral was six blocks from the school, and to get to school, the children would have to ride their bicycles to the end of the block and catch a bus. The school they were to attend was in a nice neighborhood and was new. Additionally, other children lived in the neighborhood where their new home was. Thus, the living situations in Florida and in Illinois were not substantially different.

In considering the motives of the custodial parent and the non-custodial parent with regard to the removal of the children, we do not find that the motives of either were improper. The petitioner's motive for moving was to be with her husband, a legitimate reason, and one which cannot be deemed as an attempt to frustrate the respondent's visitation. Likewise, the motives of the respondent were that he did not want to lose his visitation rights with his children as they currently existed.

The next consideration must be of how the respondent's visitation rights will be affected by the move of the children to Florida. The record established that the respondent had visitation rights with his children every other weekend, which he exercised on a regular basis. However, as the circuit court found in its order, approximately 50% of the respondent's visitation time was spent at his parents' home. On numerous occasions, the respondent's parents would pick up his children for the visitation, especially in the winter when the respondent was a referee on Friday nights. When the respondent did exercise his visitation rights, he did not necessarily spend quality time with them, but instead, he had the children help with chores. As he himself said, he was not an "entertainer."

From the evidence regarding the respondent's visitation, we conclude that the respondent is a loving father and that he does

spend time with his children. However, under the new visitation schedule, the amount of time the respondent will be able to spend with his children is not diminished, and in fact, has been somewhat increased. Additionally, as the court noted, the children are old enough that they can travel alone and can talk on the telephone so there is no reason a close relationship cannot be maintained between the respondent and the children.

We find that this case is analogous to *In re Marriage of Zamarripa-Gesundheit* (1988), 175 Ill. App. 3d 184, 529 N.E.2d 780. In *Zamarripa-Gesundheit*, the appellate court found that the petitioner's removal petition was properly granted by the trial court. The facts in that case established that the petitioner's new husband wanted to move simply because he had visited Seattle on a few occasions and liked the city. Therefore, he asked to be transferred there, which was granted. His income would not change by the move, and the petitioner's employment opportunities in Seattle were comparable to what she could find in Illinois. The court determined that the child's quality of life itself would not be directly enhanced, for the move would place her in an equivalent educational situation and her financial support would remain the same. The court did find that the move to Seattle would enhance the petitioner's quality of life, and therefore, the child's quality of life was indirectly enhanced. Further, the court determined that the respondent, who exercised his visitation rights rigorously (even more so than the respondent in the case *sub judice* did), would still be able to maintain a close relationship with his daughter by having an extended visitation during the summer and during school breaks. The court in *Zamarripa-Gesundheit* determined that the trial court's granting of the removal petition was not against the manifest weight of the evidence, and we similarly do not find that the decision of the court in the instant case was against the manifest weight of the evidence.

■■ We note that the respondent discusses the lack of evidence as to whether the petitioner could afford to return the children for visitation. The statute provides in pertinent part as follows:

"When such removal is permitted, the court may require the party removing such child or children from Illinois to give reasonable security guaranteeing the return of such children." (Ill. Rev. Stat. 1989, ch. 40, par. 609.)

From this language, evidence of the ability, financial or otherwise, to return a child to Illinois is discretionary by the use of the word "may." Thus, while evidence of how the petitioner would return the

children for visitation would have been helpful, it was not necessary unless required by the court. Therefore, the lack of evidence in this regard is not a basis for reversal of the court's order allowing removal of the children to Florida.

For the foregoing reasons, the judgment of the circuit court of Madison County granting the removal petition is affirmed.

Affirmed.

HOWERTON, J., concurs.

JUSTICE CHAPMAN, dissenting:

Every day thousands of parents send their children off to school and one of the last questions they ask is, "Do you have your lunch money?" The trial court and the majority have sent two young children from Illinois to Florida with absolutely no evidence as to how these children will be supported. This is the thought which crosses my mind after carefully reviewing the record and the majority opinion in this case. It could not be clearer that the trial court's rulings in this case were erroneous. Not only did the trial court base its decision on improper hearsay testimony, but even if the evidence admitted can be classified as nonhearsay, which it cannot, the trial court's decision was undoubtedly against the manifest weight of the evidence. For these reasons I dissent. The evidentiary issues raised by respondent will be addressed first.

Hearsay has been defined as "testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801, at 562 (5th ed. 1990).

> "The rule against hearsay is a fundamental rule of evidence, not a technical one. [Citation.] The rule exists primarily because of the importance and necessity of cross-examination. [Citation.] In cases such as the one at bar in which the interests of children are at stake, it is vital for the trial judge to have as complete a picture of the facts as possible in order to determine what course is in the best interests of the children. Relaxation of the rule against hearsay is therefore not appropriate in proceedings involving the interests of children." *In re Marriage of Kutinac* (1989), 182 Ill. App. 3d 377, 384, 538 N.E.2d 862, 866.

As the majority points out, respondent claimed that the trial court erred in admitting the following hearsay testimony from petitioner at trial: that petitioner's husband was employed in Florida; that her husband had unsuccessfully attempted to find employment in Illinois; that her husband had been injured; and that teachers' salaries in Florida are $24,000.

With regard to the first point I agree with the majority that respondent has waived the issue of whether petitioner's testimony that her husband was employed in Florida was improperly admitted hearsay testimony by failing to object to it.

The majority also asserts that petitioner's testimony that her husband unsuccessfully attempted to find employment in Illinois and that her husband was injured is irrelevant and therefore the testimony if hearsay constituted only harmless error. The majority states, "[t]he crucial information was that her husband was unemployed at the time of her remarriage, and that subsequently, he found employment in Florida." (217 Ill. App. 3d at 33.) I note initially that the irrelevancy of evidence does not cure otherwise inadmissible hearsay testimony. The fact that the evidence is irrelevant is a reason to exclude it from a case, not a justification for erroneous hearsay rulings. However, the majority cannot seriously contend that this evidence was irrelevant. It concedes that *In re Marriage of Eckert* (1988), 119 Ill. 2d 316, 518 N.E.2d 1041, requires the trial court to consider the petitioner's motive for seeking removal of the children. The evidence was introduced by petitioner to prove that her motive for moving was not to frustrate respondent's visitation rights, but because her husband was injured and could not find work in Illinois. While the evidence was certainly relevant under *Eckert,* it should not have been admitted because it was hearsay. The only foundation required by the trial court was that "she's married to the man." As far as I am aware there is no married-person exception to the hearsay rule which would permit the introduction of this obviously hearsay testimony into evidence. Petitioner should have been required by the trial court to produce a proper witness for this testimony or to forego introducing that evidence.

The majority also asserts that admission of petitioner's testimony that Florida teachers' salaries are $24,000 was proper. It states:

"[T]his information is not crucial to this case; however, we also determine that this testimony was information of which the petitioner had personal knowledge, and therefore, the testimony was not hearsay. The petitioner testified that she ap-

plied for and investigated teaching opportunities in the Cape Coral-Ft. Myers area when she was in Florida in April 1990. During her investigation, she found out that the starting salary for a teacher was $24,000. Because of her personal investigation, she had personal knowledge of the salaries, and she could testify regarding this information." 217 Ill. App. 3d at 33.

I cannot agree with the majority's conclusion that the evidence was not crucial to this case. As the majority indicates above, in determining if a petition to remove is proper, the best interests of the children are of paramount concern. (*Eckert*, 119 Ill. 2d 316, 518 N.E.2d 1041.) A factor to be considered when determining the best interests of the children is whether the move will enhance the quality of their lives. (*Eckert*, 119 Ill. 2d 316, 518 N.E.2d 1041.) It would seem impossible to determine if the move was in the best interests of the children without evidence of the financial consequences of the move. This salary evidence was the only evidence which gave even the slightest indication of the effect of the move on the family's financial condition. I believe that the trial court relied on this testimony in reaching its decision, and, therefore, the testimony was in fact "crucial."

The majority not only asserts that the testimony is not crucial, but also argues that it is not hearsay because petitioner "investigated" and "found out" that starting salaries were $24,000. The only testimony on this issue is as follows:

"Q. Have you looked into the ability to get income of your own in Florida?

A. Yes.

Q. What steps have you taken?

A. When we were down there in April I took resumes to all the schools in that area.

Q. Have you investigated the possibility of obtaining employment down there?

A. Yes. They built two new schools in Naples this year and they are hiring for both schools.

Q. And you have turned an application in for those schools?

A. No, not as of yet.

* * *

Q. Can you tell me the salary range of schools that you checked in Florida?

MR. SCHREMPF: Objection.

THE WITNESS: Yes.

MR. SCHREMPF: Hearsay, Your Honor.

THE COURT: The objection is overruled.

THE WITNESS: Yes. The school systems I checked out in Cape Coral and Ft. Myers start at $24,000 a year."

It is from this testimony that the court concludes that petitioner has personal knowledge of Florida teacher salaries thus rendering the rule against hearsay inapplicable. The majority's reasoning would result in the virtual destruction of the hearsay rule as we know it today. Instead of the witness testifying "he said ..." and then being rudely interrupted by the lawyer's "objection" and the trial court's almost inevitable response of "sustained," the witness now need only state the magic words, "I investigated and found out" to insure that his or her otherwise inadmissible hearsay testimony will be admissible. Surely the majority does not intend such a result. In this case petitioner's testimony that she "checked out" Florida employment and found that teachers' salaries were $24,000 is equivalent to her stating "I was told (by some unknown person) the salaries were $24,000 a year." Petitioner's testimony on this issue was obviously hearsay and should have been excluded by the trial court.

Unfortunately, not only has the majority approved these obvious evidentiary errors, it has also determined that the trial court's decision that the Florida move will be in the best interests of the children was not against the manifest weight of the evidence. Again, I strongly disagree with the majority's conclusion.

Section 609 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1989, ch. 40, par. 609(a)) provides:

"The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. *The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal.* When such removal is permitted, the court may require the party removing such child or children from Illinois to give reasonable security guaranteeing the return of such children." (Emphasis added.)

The result achieved by the majority, in contravention of the supreme court's mandate in *Eckert,* "dilutes the burden of proof which the legislature has placed on the custodial parent in the stat-

ute governing removal of children from this State." *Eckert*, 119 Ill. 2d at 326, 518 N.E.2d at 1045.

"The mere desire of the custodial parent to move to another State is not sufficient to establish that the move is in the child's best interests." (*Kutinac*, 182 Ill. App. 3d at 382, 538 N.E.2d at 865.) Our supreme court in *Eckert* set forth numerous factors which should be considered by the trial court in determining the best interests of the children.

> "The court should consider the proposed move in terms of likelihood for enhancing the general quality of life for both the custodial parent and the children. [Citations.] The court should also consider the motives of the custodial parent in seeking the move to determine whether the removal is merely a ruse intended to defeat or frustrate visitation. [Citations.] Similarly, the court should consider the motives of the noncustodial parent in resisting the removal. [Citation.] It is also in the best interest of a child to have a healthy and close relationship with both parents, *as well as other family members*. Therefore, the visitation rights of the noncustodial parent should be carefully considered. [Citations.] Another factor is whether, in a given case, a realistic and reasonable visitation schedule can be reached if the move is allowed." (Emphasis added.) (*Eckert*, 119 Ill. 2d at 326-27, 518 N.E.2d at 1045-46.)

The court also indicated that the trial court should be guided by the purpose of the Illinois Marriage and Dissolution of Marriage Act "to secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation." *Eckert*, 119 Ill. 2d at 328, 518 N.E.2d at 1046.

A review of the record in this case clearly reveals that the petitioner failed to establish that the move to Florida would be in the best interests of the children. The majority asserts the move will significantly enhance the children's quality of life because there will be two incomes in the family. Alternatively, the court states that even if petitioner does not work, the lives of the children will be significantly enhanced because "she will be at home for [them]." (217 Ill. App. 3d at 34.) These conclusions are simply not supported by the record. The majority makes much of the fact that petitioner's husband is now employed in Florida. However, there is no evidence whatsoever of his income. He may be making $2 per hour, $3 per hour, or volunteering his time. He may, in fact, be making more

than the petitioner's $17,000 salary; but there is absolutely *no* evidence of what his earnings are. Moreover, the only testimony which even remotely relates to the parties' financial status is petitioner's hearsay testimony involving Florida's supposed $24,000-per-year teacher's salary. Even if this evidence were considered nonhearsay, it is undisputed that petitioner does not have one of these $24,000-a-year jobs. She has had her applications in at Florida schools for over two years. Also, petitioner's statement that if she is not allowed to move to Florida she will have to work at Wal-Mart is questionable at best. She testified that she resigned her position from the St. Louis public schools shortly before trial and had not yet updated her resumes which were on file at area schools. I also note that petitioner's statement that she would remain in Illinois even though her husband has moved to Florida if the court denied her removal petition is somewhat belied by her actions of quitting her job, listing her home for sale, and renting a three-bedroom home in Florida, all of which were accomplished before the hearing on removal.

The majority also asserts, when discussing the quality-of-life factor, that the quality of the children's lives will be comparable to their life in Wood River, Illinois, because they will be living in a rented three-bedroom home which is near schools. This conclusion, however, is premised on the fact that petitioner and her husband have the money to provide this home to the children. Again, as stated earlier, the record gives no indication of the parties' economic circumstances.

All we know from the record in this case is that shortly before trial petitioner was earning $17,000 per year. Now she is unemployed. Her husband, for all we know from the record, could be earning as little as $1 per year. Therefore, based on the record before us, the move to Florida could be costing petitioner $16,999 per year. Moreover, petitioner has given up the security of owning her own home in exchange for renting a house on a month-to-month basis at a 50% increase in cost. I simply cannot find in this record the evidence upon which the majority concludes that the quality of the children's lives will be "significantly enhanced."

Another factor to be considered under *Eckert* is the effect of the move on the visitation rights of the noncustodial parent. When considering this factor the court should also consider the children's relationship with other family members. (*Eckert*, 119 Ill. 2d at 327, 518 N.E.2d at 1045.) The majority does not address the fact that nearly all of the children's extended family live in the metro-east

area. They frequently visited with their cousins, they often spent time at their paternal grandparents' home, and they had lived with their maternal grandparents for three years after the parties' divorce. Even after moving out of the maternal grandparents' home, the children saw them on a daily basis.

The majority considers only the relationship between respondent and the children and states:

> "The record established that the respondent had visitation rights with his children every other weekend, which he exercised on a regular basis. However, as the circuit court found in its order, approximately 50% of the respondent's visitation time was spent at his parents' home. On numerous occasions, the respondent's parents would pick up his children for the visitation, especially in the winter when the respondent was a referee on Friday nights. When the respondent did exercise the visitation rights, he did not necessarily spend quality time with them, but instead, he had the children help with chores. As he himself said, he was not an 'entertainer.'" 217 Ill. App. 3d at 35.

While it is true that during the winter months respondent's parents often picked up the children for visitation, the testimony does not reveal that respondent left the children with his parents the entire weekend. Moreover, while petitioner testified that the children went to respondent's parents' home once a month, she did not know if respondent was with the children during these occasions. Petitioner did not testify that all of the children's visits to respondent's parents' home were during respondent's visitation periods. Respondent's father testified the children stayed with him and his wife once a month. He testified that the children would come to visit them at times on respondent's weekends and on "other occasions *** they've called and wondered if they could come up and Ethel usually goes and gets them, picks them up. Lori has brought them occasionally." Respondent's father also testified that respondent was "quite often" present at the farm when the children were there visiting. The record does not support the trial court's nor the majority's conclusion that 50% of respondent's visitation time was spent at his parents' home. Moreover, even if 50% of his visitation time was spent at his parents' home, this would not be significant. The record reveals that during most of the visits to respondent's parents' farm, respondent was in fact present.

The majority next somehow concludes that respondent does not spend quality time with his children. The relevant testimony on this issue is as follows:

"Q. What are some of the things you do with your children during your weekends of visitation?

A. I take them to ballgames and, you know, play catch with them and stuff, but my philosophy on that is, which Lori will disagree with, is I'm not—I'm not an entertainer. I try to, you know, what we would do at home if they were there all the time. They help me mow the yard, clean trucks up. For Mom and Dad we do chores."

The majority's offhand conclusion that respondent does not spend quality time with his children is not only a distortion of the record, but it is also extremely unfair. The respondent not only plays with his children, but he also works with them. It seems that the majority has taken the saying, "All work and no play makes Jack a dull boy," to the extreme. Apparently it believes respondent should do nothing but play with the children when they visit. I cannot agree with this conclusion. There is nothing wrong with children learning responsibility by doing chores.

The next factor which should be considered by the trial court when determining if a move is in the best interests of the children is whether a realistic and reasonable visitation schedule can be reached if the move is allowed. (*Eckert,* 119 Ill. 2d at 327, 418 N.E.2d at 1045.) The majority totally ignores this factor. Its lack of discussion on this issue is obviously due to the fact that there was no evidence presented whatsoever by petitioner regarding visitation should she be allowed to move the children to Florida. There were no time schedules presented and, more importantly, no evidence was presented as to how petitioner would transport the children to Illinois from Florida or whether such transportation could be afforded. It is simply impossible to determine from the record before us if a realistic and reasonable visitation schedule can be achieved.

The majority asserts that this case is analogous to *In re Marriage of Zamarripa-Gesundheit* (1988), 175 Ill. App. 3d 184, 529 N.E.2d 780. That court found that the trial court properly granted petitioner's petition for removal. However, a simple reading of the case clearly reveals that it is not analogous to the facts presently before us. First, the petitioner's husband testified in *Gesundheit*; second, the husband was employed and would earn $50,000 in Seattle; third, there was evidence of a visitation schedule wherein the petitioner would use the respondent's child support payments to fly

the child from Seattle to Chicago; and fourth, the court was able to conclude that the financial condition of the family would remain the same in Seattle.

In this case, petitioner's evidence, briefly summarized, was "We are moving to Florida." She has not even begun to fulfill her burden of proving that the move to Florida is in the best interests of the children.

This case is much more analogous to *Eckert* and *Kutinac*. In *Eckert*, petitioner alleged that a move to Arizona would not only help her financially, but also that it would improve her son's medical condition. The supreme court reversed the appellate court and affirmed the circuit court's order denying the removal of the child to Arizona, concluding that petitioner's financial status would remain the same in Arizona and that there was no evidence introduced on how the move would affect the child's medical condition.

In *Kutinac* the petitioner argued that she should be allowed to move with her children to Florida to improve her medical condition and the medical condition of one of her children. The trial court granted the removal petition. The appellate court reversed, finding that insufficient evidence was presented to establish the effect the move would have on the medical conditions of petitioner or her son.

"While Janice stated sensible reasons for moving to Florida, she failed to introduce any evidence that the move would be in the best interests of the children." *Kutinac*, 182 Ill. App. 3d at 384-85, 538 N.E.2d at 866; see also *In re Custody of Anderson* (1986), 145 Ill. App. 3d 746, 496 N.E.2d 345.

Petitioner has clearly failed to meet her burden of proof in this case. She presented no evidence which would indicate that the move was in the best interest of the children. After reviewing the record, I was astounded at the result reached in the trial court. Unfortunately, I am even more astounded at the result reached by this court.

For all the foregoing reasons, I would reverse the judgment of the circuit court of Madison County.