In Re the MARRIAGE OF Joanna Krystyna FRANCIS, now known as Joanna Krystyna Chobot, Petitioner,

and

Steven G. Francis, Respondent.

No. 94SC538.

Supreme Court of Colorado,
En Banc.

June 3, 1996.

Rehearing Denied July 29, 1996.

Lang, Pauly & Gregerson, Ltd., Susan M. Lach, Minneapolis, Minnesota, for Petitioner.

Holland & Hart, Stephen G. Masciocchi, Frederick G. Meyer, Denver, for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

We granted certiorari in *In re Marriage of Francis,* 892 P.2d 359 (Colo. App.1994), on the following issue:

Did the trial court adopt the correct legal standards and properly apply them to the facts in entering its order of July 5, 1993, concerning custody and visitation; in particular, and without limitation, did the trial court adopt and properly apply the correct legal standards in ordering a change of custody of the four younger children from sole custody in the mother to joint custody, including a change in residential custody, in the event the mother decides "to attend schooling outside the State of Colorado?" [1]

We conclude that when a trial court considers modification of a sole custody decree that would result in changing the residential custody of the child, the court must apply the "endangerment standard" as set forth in section 14–10–131, 6B C.R.S. (1987). We further conclude that when the court is considering a removal motion that involves a change in the residential custody of the children, it must similarly apply section 14–10–131. We cannot determine whether the trial court analyzed the evidence under these stricter standards. We therefore reverse the court of appeals, with directions to remand to the trial court for reconsideration and rehearing of the appropriate pending motions under the proper standard.

## I.

The marriage of Joanna Krystyna Chobot, the petitioner, and Steven G. Francis, the respondent, was dissolved on May 30, 1992. The parties stipulated in a separation agreement that Chobot would have sole custody of the parties' five minor children, who at that time ranged in age from four to fourteen. Francis was to have parenting time as specified in the separation agreement.

At the time of entry of the dissolution decree, the parties had lived in Fort Collins, Colorado for all of the children's lives. The separation agreement included a provision documenting their intent that: "it is in the best interests of the children to have continued interaction with both parents in the Fort Collins area. The parties make the statement knowing that Respondent (Mother) presently intends to go to school outside of the Fort Collins area...."

In March of 1993, Chobot was accepted into a two year program at a physician's assistant's school on Long Island, New York. She had applied to numerous other programs, but was accepted only at the program in New York. At no time during the initial dissolution proceedings or in the hearings relating to the move to New York was the appropriateness of Chobot's decision to pur-

---

**1.** Certiorari was initially granted on the following issue:

Whether the court of appeals erred in affirming the trial court's application of both the best interest standard found in section 14–10–131.5, 6B C.R.S. (1987), and the endangerment standard found in section 14–10–131, 6B C.R.S. (1987), to a modification from sole to joint custody that included a change in physical/residential custody.

The scope of certiorari was modified as noted in the question above following oral argument in the case.

sue physician's assistant's training questioned.[2]

When Francis learned of Chobot's intent to attend the New York program, he filed a motion for modification of custody seeking a change in the custody of all five children from sole custody in Chobot either to joint custody or to sole custody vested in him. He also filed a motion to prohibit Chobot from removing the children from the state. Chobot filed a motion to amend the visitation schedule to accommodate the prospective move. The trial court held a three day hearing on the pending motions during which evidence was introduced from numerous witnesses both in person and by deposition. On July 5, 1993, the trial court ruled that Chobot was restrained from removing the children from Colorado; and that if Chobot chose to attend schooling outside the state, custody of the four younger children would be modified from sole to joint with residential custody vesting in Francis. If Chobot chose to remain in the Fort Collins area, then sole custody of the four youngest children would remain vested in her. The trial court modified custody of the oldest child from sole to joint irrespective of any pending move.

Chobot appealed the trial court ruling to the Colorado Court of Appeals where it was affirmed. The court of appeals determined that *In re Marriage of Wall,* 868 P.2d 387 (Colo.1994) (*Wall II*), aff'g, *In re Marriage of Wall,* 851 P.2d 224 (Colo.App.1992) (*Wall I*), required the trial court to apply the "best interests" standard enunciated in section 14–10–131.5(1), 6B C.R.S. (1987), when considering a change from sole to joint custody; and that the trial court in this case applied the standard appropriately and should therefore be affirmed. Judge Ney dissented on the grounds that *Wall II* did not involve a change in residential custody. He contended that a change of residential custody should invoke the stricter "endangerment" standard of section 14–10–131, 6B C.R.S. (1987).

We granted certiorari to determine: 1) what standard a trial court should apply when ruling upon a motion for change of custody from sole to joint that involves a change in the child's residential custody; 2) what standard applies in a removal situation that could result in a change of the primary residential custodian; and 3) whether the trial court in this case applied the standards correctly.

## II.

■ The tension presented by the law applicable to this case arises out of the differences between two legal standards. The first standard appears in section 14–10–131, 6B C.R.S. (1987), under the caption "Modification of sole custody." It is referred to as the "endangerment standard" and it reads as follows:

The court shall not modify a prior custody decree granting custody to one party unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child. In applying these standards, the court shall retain the custodian established by the prior decree unless:

(a) The custodian agrees to the modification;

(b) The child has been integrated into the family of the petitioner with the consent of the custodian; or

(c) The child's present environment endangers his physical health or significantly impairs his emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

§ 14–10–131, 6B C.R.S. (1987).

The second standard is referred to as the "best interests standard." It appears in section 14–10–131.5, 6B C.R.S. (1987), under the caption "Joint custody modification—termination":

(1) [A]n award of joint custody may be modified or terminated upon motion of one

**2.** In fact, the separation agreement contemplated Francis paying maintenance to Chobot for the

stated purpose of enabling her to go to school to become a physician's assistant.

or both parties or on the court's own motion, if such modification or termination is in the best interests of the child, as specified in 14–10–124(1.5), and the harm likely to be caused by the change of environment is outweighed by the advantage of such change to the child. The court shall also take into account the pattern of involvement of the parties with the child.

. . . . .

(4) Any order awarding custody of a minor child entered by a court of this state or any order of a court in another state which is enforceable by a court of this state pursuant to 14–10–123 may be modified from sole custody to joint custody at any time pursuant to this section.

§ 14–10–131.5(1) & (4), 6B C.R.S. (1987).

Hence, one statute contemplates that a trial court shall examine only the best interests of the child in changing custody. The other mandates that the court determine whether the child would be endangered by remaining with the custodial parent before granting a change of custody. The titles of the two statutes imply that when the trial court is considering modification of a sole custody decree, it is to apply the endangerment standard; but when it is considering modification of a joint custody decree, it is to apply the best interests standard. However, the last sentence of section 14–10–131.5 appears to indicate that sole custody may also be modified to joint custody under the terms of the best interests standard.

Petitioner Chobot argues that the trial court improperly applied the best interests standard to the facts of this case in concluding that it would be in the children's best interests to remain in Fort Collins. She contends that when a change in a child's principal residential custody is at issue, the appropriate standard is the endangerment standard and that there was no evidence in the record that the children's placement in their mother's sole custody was endangering them.

Respondent Francis contends that the appropriate standard to be applied when the pending issue is a change from sole to joint custody is the best interests standard.

Francis further contends that the trial court made findings in its order under both standards: first, that the children's best interests would be served by remaining in the Fort Collins area; and second, that a move to New York "would be the creation of an environment which could significantly impair their emotional development."

We conclude that the public policy and legislative history underlying the two different standards require courts to focus on the practical impact of a custodial order upon the children, not just the legal consequences. In this case the practical effect of the trial court's orders was to change the children's residential custody from one parent to the other, contingent upon the happening of a future event: to wit, the mother's move to New York. Therefore, the trial court was required to apply the endangerment standard in evaluating the motions before it.

### III.

The threshold issue presented to the trial court was whether Chobot should be permitted to remove the children to New York. However, the trial court also addressed modification of custody as a part of the removal analysis. Since the modification of custody issue forms the basis for any conceptual understanding of this area of the law, we begin our analysis there.

Prior to the enactment of section 14–10–131, modification of child custody orders was governed by 1963 C.R.S. § 46–3–6. Under this statute, a court had power to modify its custody orders as circumstances required. Thus, a court could modify a custodial order simply upon a showing that circumstances had changed and the modification would serve the best interests of the child. *Aylor v. Aylor*, 173 Colo. 294, 296, 478 P.2d 302, 303 (1970).

In 1971, Colorado enacted the Uniform Dissolution of Marriage Act (UDMA), ch. 130, sec. 1, §§ 46–1–1 to –32, 1971 Colo. Sess. Laws 520, 520–32 (currently at §§ 14–10–101 to –133, 6B C.R.S. (1995 Supp.)), based upon the Uniform Marriage and Divorce Act, 9A Uniform Laws Annotated, Master Edition. The UDMA recognizes and carries out the

philosophy that assuring stability and finality in a child's custody is an important factor in the post-dissolution emotional health of a child.[3] Section 14–10–131, which has historically governed modification of custody in Colorado, implements the concept that emotional stability in a child's life is of great significance. In order to promote such emotional stability, the legislature protected the custodial relationship of parent and child by making it difficult to modify.

When the General Assembly enacted the UDMA, Colorado's laws on dissolution did not contemplate the possibility of joint custody. In 1983, however, the General Assembly did recognize joint custody and amended the statute accordingly. *See* ch. 178, sec. 1–4, §§ 14–10–108, 123.5, 131.5 and 124, 1983 Colo. Sess. Laws 645, 645–47. Included among these enactments was section 14–10–131.5, which addresses modification of joint custody decrees. Because both sections 14–10–131 and 14–10–131.5 now address modification of custody, the courts have suffered confusion as to which section should be applied under what custody modification scenarios.

More specifically, since both sections can be interpreted to apply to a modification from sole custody to joint custody, we are required to analyze the specific parameters of the statutory sections in order to determine which standard applies in this case.

 In interpreting statutes, a court's primary task is to give effect to the intent of the General Assembly. *Estate of David v. Snelson,* 776 P.2d 813, 817 (Colo.1989). In addition, a court should, where possible, adopt a construction that would harmonize provisions rather than create an inconsistency or conflict in the statutory scheme. *People v. District Court,* 834 P.2d 236, 239–40

(Colo.1992); *City of Ouray v. Olin,* 761 P.2d 784, 788 (Colo.1988).

The intent of the legislature in enacting section 14–10–131 of the UDMA was clearly to emphasize the importance of stability in a child's custodial arrangements. The question we face is whether, in later enacting section 14–10–131.5, the General Assembly meant to deemphasize the importance of such stability by requiring a lesser standard to modify custody or whether its intent was to distinguish the application of the two standards and allow a harmonious interpretation of the sections.

Since the apparent conflict of standards arose out of the enactment of the joint custody statute, we look to the section defining joint custody and its legislative history as important tools in understanding the legislature's intent. Joint custody is defined in section 14–10–123.5, 6B C.R.S. (1987). The legislative history of the section was traced by the court of appeals in *In re Marriage of Wall,* 851 P.2d 224 (Colo.App.1992) (*Wall I*), aff'd, 868 P.2d 387 (Colo.1994) (*Wall II*). The court of appeals found that in the 1983 session the General Assembly considered two different joint custody bills: Senate Bill 348 and Senate Bill 286.

> One of those bills, Senate Bill 348, was patterned after California statutes in which the term "joint custody" embodied both "joint legal custody" (shared decision-making rights, responsibilities, and authority relating to the child's health, education and welfare) and "joint physical custody" (alternative residential stewardship of the child)....
>
> The second bill ... Senate Bill 286 ... defined "joint custody" as authority for shared decision-making and provided that

---

3. *See* Unif. Marriage and Divorce Act § 409, Commissioner's comment, 9A U.L.A. 628–29 (1987); *see also In re Custody of Harne,* 77 Ill.2d 414, 33 Ill.Dec. 110, 113, 396 N.E.2d 499, 502 (1979) (ruling that in creating presumption favoring present custodian, legislature sought to promote a stability and continuity in child's custodial and environmental relationship which is not to be lightly overturned); *In re Custody of Andre,* 234 Mont. 80, 761 P.2d 809, 811 (1988) (finding stability of custody arrangement to be one of the most crucial factors in a child's devel-

opment); *Korol v. Korol,* 188 Mont. 351, 613 P.2d 1016, 1019–20 (1980) (stating that purpose of Uniform Marriage and Divorce Act is to preserve basic policy of custodial continuity, maximize finality of custody provisions, prevent "ping-pong" custody litigation, and to implement the principle that finality of custody decree is more important to the best interest of the child than a determination of which parent should have custody); Joan Wexler, *Rethinking the Modification of Child Custody Decrees,* 94 Yale L.J. 757, 773–79 (1985).

orders awarding joint custody "may designate one party as a residential custodian." *Wall I,* 851 P.2d at 225. Senate Bill 348 was not adopted; Senate Bill 286 was. The resulting language defined joint custody as "an order awarding *legal* custody of the minor child to both parties and which provides that all decisions regarding the health, education, and general welfare of the child shall be made jointly." Ch. 178, sec. 2, § 14–10–123.5, 1983 Colo. Sess. Laws, 645, 645 (emphasis added).

The enactment also stated that "[t]he order may designate one party as a residential custodian for the purpose of determining the legal residence of the child...." *Id.* To separate the concept of joint custody from residential custody even more distinctly, the General Assembly later amended section 14–10–123.5 to add the additional statement: "but such provision shall have no legal effect on the rights or responsibilities of the parties with regard to joint custody." Ch. 110, sec. 5, § 14–10–123.5, 1987 Colo. Sess. Laws 574, 575; *Wall I,* 851 P.2d at 226.

■ From this legislative history we find that the General Assembly intended joint custody to define a sharing of legal custody, but to be distinct from the issue of residential custody. Instead, residential custody was to remain an independent variable. An award of sole custody, in contrast, would necessarily include both the legal and residential custody of the child.

Because the focus of a joint custody determination is on the status of the child's legal custody, we find that interpreting section 14–10–131.5 as overriding section 14–10–131 in regard to a change of residential custody would result in an outcome contrary to the intent of the legislature.

■ Francis cites *In re Marriage of Wall,* 868 P.2d 387 (Colo.1994) (*Wall II* ), in support of his argument that the best interests standard of section 14–10–131.5 should apply in a modification from sole to joint custody. *Wall II* does state that "section 14–10–131.5 is the controlling statute in those cases where a non-custodial parent seeks a modification from sole custody to joint custody...." *Wall II,* 868 P.2d at 390. However, *Wall II* did not involve a change of residential custody but instead only a change in legal custody. *Wall II,* 868 P.2d at 389. Thus, we limit the holding in *Wall II* that section 14–10–131.5 applies to modification from sole to joint custody to those situations where only modification of legal custody, not residential custody, is at stake.

Furthermore, both this court in *Wall II* and the court of appeals in *Wall I* specifically recognized the dichotomy between physical residential custody and the concept of joint legal custody. *Wall II,* 868 P.2d at 390 (citing legislative recognition that a change in legal custody under joint custody does not necessarily result in as disruptive a change to the child as that occasioned by a change in residential custody) (citing *Wall I,* 851 P.2d at 227).

The legislature and the courts have consistently recognized that emotional stability in a child's life is intertwined more closely with the child's residential custody than with legal custody, or, for that matter, with a geographic location. Hence, we conclude that the application of section 14–10–131.5 is limited to those situations in which the residential custody of the child will not be changed by the modification, and that section 14–10–131 is the standard to be applied whenever change of primary residential custody is at issue.[4] To hold otherwise would undermine the legislative intent that a child's residential custody arrangements should be stable and

---

4. Other states also hold that a change in primary residential custody requires application of the more stringent standard. *See Pfeiffer v. Pfeiffer,* 364 N.W.2d 866, 868 (Minn.Ct.App.1985) (even though joint legal custody was left unchanged, modification of physical custody required application of endangerment or consent standard); *Moore v. Moore,* 849 S.W.2d 652, 655 (Mo.Ct. App.1993) (due to reluctance of courts to uproot children once they have been placed in the physical custody of one parent for a long period of time, a significant change in circumstances must be found before placing primary physical custody with the other parent); *cf. In re Marriage of Lawson,* 44 Colo.App. 105, 108, 608 P.2d 378, 380 (1980) (since no change in physical custody was involved where father, who already had temporary physical custody, moved to change custody to award permanent custody to himself, best interest standard applied).

final, absent some showing of danger to the child or consent of the custodial parent.

The trial court granted Francis residential custody of the children, contingent upon the mother's decision to move to New York. However, with the exception of the oldest child, this ruling was based only on evidence that it was in the best interests of the children to reside with their father in Fort Collins if the mother were to move. The evidence failed to prove any current or potential endangerment to the children if they remained in the physical custody of their mother, wherever she might live. Chobot was the primary care-giver of the children both before and after the dissolution. With respect to the four youngest children, there was no contention that her custodial relationship with them was harmful.

## IV.

We turn now to the interrelationship between modification of custody and a request for removal. Colorado has traditionally decided issues of removal based upon the general best interests of the child standard. *Hayes v. Hayes,* 134 Colo. 315, 303 P.2d 238 (1956). However, this court has never addressed what the "best interests of the child" means in the context of a removal issue, as distinguished from the context of an award of original custody.

In *In re Marriage of Murphy,* 834 P.2d 1287 (Colo.App.1992), the court of appeals acknowledged that a motion to remove a child is generally governed by the best interests standard set forth in section 14–10–124, 6B C.R.S. (1987). That court then listed six factors that should be considered in determining the best interests of the child. In this list the court of appeals included: "whether the non-custodial parent's motion to prevent removal is, in effect, a request for a change of custody and none of the provisions of § 14–10–131 respecting change of custody have been established by the evidence." *Murphy,* 834 P.2d at 1291.

We endorse the inclusion of the endangerment factor by the court of appeals; however, we broaden its scope. We conclude that, because of the importance of a child's continuing stability in his or her relationship with the residential custodian, consideration of the standards of section 14–10–131 should be taken into account in any removal decision. A removal dispute inherently involves potential modification of custody; the non-custodial parent is contesting the custodial parent's request to relocate with the children. The residential custody of the children is, therefore, explicitly or implicitly at issue. In order to honor the legislative determination favoring the residential custodian of the children, we hold that the trial court must analyze a removal petition in light of the endangerment standard.

Other jurisdictions that have adopted the Uniform Marriage and Divorce Act have similarly given deference to the need for stability in a child's residential custody when faced with a petition for removal.[5] The same deference has also been established in many states that have not adopted the Uniform Act. *See, e.g., deBeaumont v. Goodrich,* 162 Vt. 91, 644 A.2d 843, 850 (1994). Although historically most states discouraged removal of the children, a growing number of states now presume that the custodial parent's decision to move with the child is affirmatively in the best interests of that child.[6]

5. *See Auge v. Auge,* 334 N.W.2d 393, 396 n. 3 (Minn.1983) (holding that a custodial parent's presumptive entitlement to remove the child to another state is based partially on the principle that interruption of the parent-child relationship may be seriously detrimental to the child's psychological development); *In re Marriage of Cornish,* 780 S.W.2d 62, 64 (Mo.Ct.App.1989) (finding that absent negative factors in child's relationship with custodial parent, past custody of child by moving party and party's need to move from state are sufficient to warrant permission to remove child from jurisdiction); *Garcia v. Garcia,* 81 N.M. 277, 466 P.2d 554,

556 (1970) (ruling that despite lack of specific finding that removal was in best interest of children, removal should be permitted if child's interests are best served by staying with custodial parent).

6. For instance, in *In re Marriage of Burgess,* 13 Cal.4th 25, 51 Cal.Rptr.2d 444, 913 P.2d 473 (1996), the California Supreme Court recently overruled a long line of court of appeals cases that placed the burden on the custodial parent to justify the proposed move as "necessary" or "essential and expedient." *Id.* 51 Cal.Rptr.2d at 454, 913 P.2d at 483 n. 10. Instead, California

Initially, courts discouraged removal in part to promote a meaningful relationship between the child and the non-custodial parent and in part to avoid disputes over the appropriate jurisdiction of the court prior to the passage of the Uniform Child Custody Jurisdiction Act. *See Auge v. Auge,* 334 N.W.2d 393, 399 (Minn.1983). The jurisdictional issue has now been resolved. In addition, most states have come to recognize that dissolution of marriage changes the family dynamic, resulting in the creation of a new family unit for the child.[7] Although the noncustodial parent's interests must certainly not be disregarded, the child's interests have become so interwoven with the well-being of the new family unit that "the determination of the child's best interests requires that the interests of the custodial parent be taken into account." *Cooper v. Cooper,* 99 N.J. 42, 491 A.2d 606, 612 (1984). Further, we live in an extremely mobile society in which parents in an intact family move to accommodate job, education, and other demands. It is unrealistic to assume that a divorced parent will not be required to do the same.

> [A] noncustodial parent is perfectly free to remove himself from this jurisdiction despite the continued residency here of his children in order to seek opportunities for a better or different life style for himself.... The custodial parent, who bears the essential burden and responsibility for the children, is clearly entitled to the same option to seek a better life for herself and the children....

*D'Onofrio v. D'Onofrio,* 144 N.J.Super. 200, 365 A.2d 27, 30 (Ch.Div.), *aff'd,* 144 N.J.Super. 352, 365 A.2d 716 (App.Div.1976).

In sum, we find that the child's best interests are served by preserving the custodial relationship, by avoiding relitigation of custody decisions, and by recognizing the close link between the best interests of the custodial parent and the best interests of the child. In a removal dispute, this leads logically to a presumption that the custodial parent's choice to move with the children should generally be allowed.

We find the reasons for establishing a presumption in the custodial parent's favor to be persuasive and supported by our statutory scheme. The legislature's adoption of section 14–10–131 shows its intent to emphasize the importance of stability in a child's relationship with his or her primary care-giver after dissolution. Our legislative enactments support the philosophy that the child's best interests are tightly interwoven with the welfare of the new family unit as a whole, and that the custodial parent's decisions should be afforded deference.

Thus, we hold that in removal cases where the parent with sole residential custody wishes to move with the child, the trial court should take the following steps to determine whether the proposed move is in the best interests of the child. First, the custodial parent must present a *prima facie* case showing that there is a sensible reason for the move. *Murphy,* 834 P.2d at 1291.[8] For instance, a move based on the custodial parent's vindictive desire to interfere in the relationship between the child and the non-custodial parent is not a legitimate reason for the move. Once the *prima facie* case has been made, a presumption allowing the child to remain with the custodial parent arises and the burden shifts to the non-custodial

now recognizes a presumptive right of the custodial parent to move with the child and places a "substantial" burden on the noncustodial parent to show that the move will be harmful to the child. *Id.* 51 Cal.Rptr.2d at 453, 913 P.2d at 482; *see also Mize v. Mize,* 621 So.2d 417, 419 (Fla.1993); *Newhouse v. Chavez,* 108 N.M. 319, 772 P.2d 353, 356–57 (Ct.App.1988), *cert. denied,* 108 N.M. 197, 769 P.2d 731 (1989); *Taylor v. Taylor,* 849 S.W.2d 319, 328 (Tenn.1993); cf. *Tropea v. Tropea,* 87 N.Y.2d 727, 642 N.Y.S.2d 575, 665 N.E.2d 145 (1996) (overruling previous formula used in New York requiring the custodial parent to show "exceptional circumstances" to overcome the presumption against removal).

7. *D'Onofrio v. D'Onofrio,* 144 N.J.Super. 200, 365 A.2d 27, 29–30 (Ch.Div.), *aff'd,* 144 N.J.Super. 352, 365 A.2d 716 (App.Div.1976).

8. The *prima facie* case established in *Murphy* also requires a showing that the move is consistent with the child's best interests. Since we are affording the custodial parent a presumption that the child's best interests are served by remaining with that parent, we decline to incorporate that portion of the *Murphy* test at this stage of the trial court's inquiry.

parent to show that the move is not in the best interests of the child. Such presumption is necessarily weakened to the extent parents share both residential and legal custody and we decline here to resolve the issue of how removal should be evaluated in a circumstance in which both parents truly share joint *residential* custody.

The non-custodial parent can overcome the presumption by a showing that one of the factors of section 14–10–131(2) has been met; namely, that: 1) the custodial parent has consented to the modification of custody to the non-custodial parent, 2) the child has been integrated into the non-custodial parent's family with the custodial parent's consent, or 3) the child would be endangered by the move. The question of whether a child's environment endangers that child contemplates threats to the child's physical health and emotional development. § 14–10–131(2)(c), 6B C.R.S. (1987). Examples of harm rising to the level of endangerment include a range of problems created by the behavior of the custodial parent or other factors affecting the child's environment.[9] What constitutes endangerment to a particular child's physical or emotional health is a highly individualized determination. If the child is endangered by the move, then the application of section 14–10–131 is dispositive and the removal petition would be denied.

If, however, there is no credible evidence of endangerment, then the non-custodial parent can also overcome the presumption by establishing by a preponderance of the evidence that the negative impact of the move cumulatively outweighs the advantages of remaining with the primary caregiver. A trial court should allow the residential custodian to move with the child unless the evidence shows that the disadvantages of moving are great enough to outweigh the advantage of staying with the same parent.[10] The trial court may consider: 1) whether there is a reasonable likelihood the proposed move will enhance the quality of life for the child and the custodial parent, including the short and long term effects of the move on the custodial parent's ability to support the child; 2) whether the court is able to fashion a reasonable visitation schedule for the non-custodial parent after the move and the extent of the non-custodial parent's involvement with the children at the old location; 3) whether there is a support system of family or friends, either at the new or old location; and 4) educational opportunities for the children at the new and old locations. If the cumulative weight of these factors, together with others the trial court may find relevant,[11] outweighs the presumption favoring the custodial parent, then the removal petition should be denied. Otherwise, the custodial parent should be entitled to the benefit of the presumption.

9. *See, e.g., In re Marriage of Agner,* 659 P.2d 53, 55 (Colo.App.1982) (endangerment found where record revealed abundant evidence that children feared mother's new husband would sexually molest them); *In re Custody of Sussenbach,* 108 Ill.2d 489, 92 Ill.Dec. 556, 559–60, 485 N.E.2d 367, 370–71 (1985) (among other factors, stepfather's emotional problems and use of force against child was enough to overcome presumption in favor of present custodian); *McClelland v. McClelland,* 231 Ill.App.3d 214, 172 Ill.Dec. 461, 468–69, 595 N.E.2d 1131, 1138–39 (1992) (mother's mental illness and delusions focusing around son had seriously damaging effects on son); *Smart v. Smart,* 94 Ill.App.3d 791, 50 Ill.Dec. 587, 591, 419 N.E.2d 695, 699 (1981) (slum character of child's previous neighborhood endangered the child's physical, mental and emotional health); *In re Marriage of Miller,* 251 Mont. 300, 825 P.2d 189, 192 (1992) (child endangered where custodial parent repeatedly abused alcohol and exhibited an unstable living situation).

10. *See also In re Marriage of Shelton,* 217 Ill. App.3d 26, 159 Ill.Dec. 939, 944, 576 N.E.2d 862, 867 (1991). Some specific factors considered by other jurisdictions that have adopted the Uniform Marriage and Divorce Act regarding the best interests of the child in a removal case include the effect of removal on the child's contact with the non-custodial parent, *In re Marriage of Dusing,* 654 S.W.2d 938, 942 (Mo.Ct.App. 1983); support of the child's community, relatives and friends in both the old and new locations, *Adams v. Adams,* 812 S.W.2d 951, 956 (Mo.Ct.App.1991); and the moving parent's ability to show adequate living arrangements in the new location, *Boll v. Boll,* 219 Neb. 486, 363 N.W.2d 542, 545 (1985).

11. Since the issue is not before us in this case, we decline to decide whether the non-custodial parent can contractually bind the custodial parent to remaining in one location under the terms of a separation agreement.

Child custody disputes present agonizing decisions for trial court judges. While it would undoubtedly be better for the children if every divorced parent maintained close emotional and geographic ties to their children, the realities of life after divorce often interfere. After an award of custody is entered, the court should give deference to the decisions made by the custodial parent and not substitute its own judgment for that of the parent absent some reason to do so. Neither the child nor the parents benefit from repeat appearances before the court or from the uncertainty caused thereby. Instead, uncertainty only serves to threaten the child's stability and undermine the parties' acceptance of the original award of custody.

The trial court here made no finding of specific physical or emotional harm that would result to the children if they moved to New York with their mother. The court gave no weight to the relationship between the custodial parent and the children and focused primarily upon the geographical advantages to the children of remaining in Fort Collins. Although the trial court did enter a finding that the change of environment required in moving to New York "would significantly impair [the children's] emotional development," it is unclear whether the trial court was expanding upon the best interests analysis or was truly addressing the endangerment standard. Because we have clarified application of the standards of section 14–10–131 and accorded the custodial parent a presumption, we must direct that this case be remanded for the trial court's analysis under these standards. Since three years have elapsed following the entry of the trial court order that is the subject of this appeal, we are uncertain what the present situation of the parties and the children might be. New evidence may need to be introduced concerning the current circumstances of the parties and of the children.[12] Thus, we conclude that the trial court's order must be overturned.[13]

V.

We therefore reverse the court of appeals' decision. We return this case to the court of appeals with directions to remand it to the trial court for a hearing on the motions to permit or deny removal of the children if still at issue. If Chobot still desires to remove the children to New York and Francis opposes it, the trial court must consider the issue under the rubric of the standard for removal as outlined herein.

---

**12.** The analysis with respect to the oldest child may be different, because she has been living under a joint custody decree and Joint Parenting Plan for the last three years. Should either party wish to revisit the previous motions as they relate to the oldest child, the trial court will need to consider all relevant evidence. We reverse and remand the trial court order changing oldest child's custody because we are unable to determine whether the trial court applied the proper standard. We recognize that, because of her age and circumstances, the trial court may not be called upon to reconsider new motions or may find them moot.

**13.** We also note that the trial court entered a contingent modification of custody order, dependent upon Chobot moving to New York. Change of custody may only be ordered based on circumstances existing at the time the change is being contemplated. An automatic order of modification in the future is thus inappropriate. A court cannot determine what will be in the child's best interests in the future. *Koenig v. Koenig*, 782 S.W.2d 86, 90 (Mo.Ct.App.1989).